# United States Court of Appeals

## FOR THE EIGHTH CIRCUIT

_____

No. 02-4107

_____

| | | |
|---|---|---|
| Harriet Hudson, on behalf of Sterling Jones, | * | |
| | * | |
| | * | |
| Appellant, | * | |
| | * | Appeal from the United States |
| v. | * | District Court for the |
| | * | Eastern District of Missouri. |
| Jo Anne B. Barnhart, Commissioner, | * | |
| Social Security Administration, | * | |
| | * | |
| Appellee. | * | |

_____

Submitted:  May 16, 2003

Filed:  September 30, 2003

_____

Before WOLLMAN, MAGILL, and BEAM, Circuit Judges.

_____

WOLLMAN, Circuit Judge.

In April 1999, Harriet Hudson applied for Supplemental Security Income benefits on behalf of her son, Sterling Jones (Sterling).  After her application for benefits was denied, she requested a hearing before an Administrative Law Judge (ALJ), who determined that Sterling was not disabled.  Hudson's administrative appeal was unsuccessful, and she then sought judicial review.  Hudson now appeals

from the district court's[1] affirmance of the Commissioner's denial of benefits. We affirm.

## I. Background

Sterling was born on May 15, 1986. During his seventh grade year, Sterling's parents and his school requested a multidisciplinary evaluation. A Special School District Evaluation Summary, dated February 9, 1999, certified that Sterling, who was then functioning in the lower third of his class, required special education and related services. Hudson reported that Sterling seemed to enjoy school and made friends easily but became frustrated when doing homework. The summary indicated that Sterling had problems that "may interfere with learning," including "difficulty organizing time and work materials, difficulty initiating and remaining on task, needing directions/lessons repeated, requiring one-to-one instruction, not completing class assignments or homework, working slowly, and having difficulty working independently." The summary also indicated that teachers did not believe Sterling was "mean-spirited"; rather, they viewed him as "excessively impulsive and immature," frequently acting as a "class clown."

On February 24, 1999, Sterling was seen by Dr. Michael J. Shanker at Northwest Psychiatric Associates. Sterling was diagnosed as suffering from attention-deficit/hyperactivity disorder (ADHD) and oppositional defiant disorder. He was assigned a rating of 55 on the Global Assessment of Functioning Scale (GAF).[2] Dr. Shanker recommended that Sterling resume taking the drug Ritalin.

---

[1]The Honorable Mary Ann L. Medler, United States Magistrate Judge for the Eastern District of Missouri, to whom the case was submitted by consent of the parties pursuant to 28 U.S.C. § 636(c).

[2]According to the Diagnostic and Statistical Manual of Mental Disorders 32 (4th ed. Text Revision 2000), the Global Assessment of Functioning Scale is used to

By letter dated March 24, 1999, Hudson was informed that Sterling would be suspended from school for the remainder of his seventh grade year. An earlier letter indicated that Sterling had been referred to the assistant principal's office twenty-nine times during the school year.

Sterling was seen again at Northwest Psychiatric Associates in March and April 1999. During the April visit, his parents reported that when on medication Sterling was more compliant, talked back less, and had fewer arguments with his siblings.

On a teacher questionnaire dated June 4, 1999, school counselor Marilyn Edds-England stated that Sterling had attention problems and difficulty keeping up with the class. She commented that Sterling was a "sweet little boy" in one-on-one situations, but that because of his immaturity he could be difficult in a classroom setting.

On July 9, 1999, Sterling was evaluated by Sherman Sklar, a consultative psychologist. Hudson reported that Sterling had earlier been taking Ritalin and that although she had noticed improvements in his behavior, she had taken him off the medication because of concerns about depression. Hudson also reported that the medication was subsequently restarted, but that Sterling had quit taking it at the end of the school year. Sklar observed that Sterling was very quiet; that his behavior was socially appropriate with no signs of overactivity; that his focus was good; and that he showed no sign of attentional deficit. Sklar determined that Sterling did not

report "the clinician's judgment of the individual's overall level of functioning." GAF scores of 41 to 50 reflect "[s]erious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." Manual at 34. GAF scores of 51-60 indicate "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)." Id.

exhibit any symptoms of ADHD, but that his history instead pointed to a conduct disorder. He characterized Sterling's social attitudes and behaviors as "oppositional and rebellious." Sklar opined that Sterling was "capable of understanding and remembering simple instructions" and that he would "have no difficulty with tasks requiring sustained concentration and persistence." He assigned Sterling a GAF of 57.

Sterling returned to Northwest Psychiatric Associates on August 9, 1999, and was diagnosed with major depressive disorder, ADHD, and oppositional defiant disorder. He was prescribed an additional medication.

During the 1999-2000 academic year, Sterling repeated the seventh grade. On a November 17, 1999, questionnaire, Elizabeth Bellis, Sterling's teacher, reported that he was constantly disruptive and did not seem to be able to control his behavior. Bellis indicated that Sterling was not keeping up with his class work, which had already been modified, did not follow instructions, and needed one-on-one attention. Bellis also reported that although Sterling aggravated other students, he was "somewhat likable to them" and was "accept[ed].

Sterling was seen again at Northwest Psychiatric Associates in both November and December 1999. During the December session, Sterling reported that he was passing all his classes, that he was completing his assignments at school, and that his focus had improved.

Sterling's Individualized Education Program (IEP) was reevaluated in February 2000, and his IEP team agreed that he continued to require special education. Teachers observed Sterling's "high activity level, difficulty following rules, impulsiv[eness], excessive need for attention, verbal outbursts, and inability to accept any personal blame." He was described as the "'class clown' to excess." His formal discipline record documented at least seventeen office referrals for a variety of

violations and at least two out-of-school suspensions. According to the Reevaluation Summary, "Behaviors which were noted at the time of the 2/99 initial SSD evaluation have escalated in frequency and intensity. The reevaluation team determines that behaviors have now become diagnostically significant." Nevertheless, Sterling also demonstrated academic skills that, although below grade level, "[were] certainly functional." In addition, he enjoyed "creative endeavors" and could "write at length on topics of personal interest." The IEP team observed that Sterling's "chances of success appear to be increased in a smaller group." Teachers also opined that medication was "a helpful intervention for [Sterling]," noting that that "it [was] quickly apparent if [the medication] [had] been missed or delayed." It was recommended that he be moved from a modified regular program to a self-contained program.

Sterling returned to Northwest Psychiatric Associates in March 2000, at which time it was reported that he was maturing, had friends, and was not fighting with his siblings as much. No additional suspensions from school were reported.

Sterling was seen by Dr. Kabir, a psychiatrist, in August and September 2000. Dr. Kabir diagnosed Sterling with dysthymic disorder and assigned him a GAF of 50.

During the administrative hearing held on September 7, 2000, Hudson testified that three of Sterling's classes were in regular classrooms and that his other three classes were in a resource room. She testified that Sterling had difficulty concentrating, was in a "playful mood all the time," had difficulty keeping friends, and was overly emotional, crying "at least three times a day." Nevertheless, Hudson reported that Sterling's behaviors had improved somewhat with medication. She indicated that she had not recently had any notes or telephone calls from the school regarding his behavior.

At the close of the hearing, the ALJ ordered a new psychological evaluation. On October 31, 2000, Alan Reeves, Ph.D., conducted this evaluation, during which Hudson reported that Sterling's grades had "improved tremendously," and that he was now a "B" student. Dr. Reeves made the following conclusions:

> [Sterling] appears to have the ability to understand[] and remember simple instructions. He has the ability to follow simple instructions. He has the ability to sustain his concentration and persist on a task. He appears to have a low frustration tolerance however and his judgment is in question. He has the ability to perform activities on a schedule and to maintain . . . regular attendance, with assistance. He will have difficult[y] however with any type of monitoring or supervision on a task. . . . He will need to have some type of special supervision (a person that will be patient and understanding of him, for him to complete a task or to stay on a job). His ability to make daily decisions is poor and will effect [sic] his success in school and in life. . . . His ability to complete a normal school or work day will be interrupted by his psychological based symptoms . . . and will cause him to need more rest from task[s] tha[n] normal . . . . [Sterling's] social skills are poor as with most ADHD children. His difficulty getting along with others will interfere with his academic and work success. His conflict with peers will be distracting and will isolate him. . . . H[e] has some restrictions of daily activities in the form of his poor social skills and his poor judgment.

(Admin. R. at 165-166.) Dr. Reeves diagnosed Sterling with ADHD and dysthymia and assigned him a GAF of 59. Dr. Reeves also completed a Medical Source Statement Of Ability To Do Work-Related Activities, dated November 6, 2000, on which he marked blocks indicating that Sterling had no useful ability to function in a wide array of work-related activities.

During the January 11, 2001, administrative hearing, Hudson testified that Sterling was taking medication for both ADHD and depression and that the

medication was helping. She stated that during the first quarter of the current school year, Sterling was a "B" student.

Medical expert Allan Barclay, Ph.D., also testified at the January 11 hearing. Dr. Barclay opined that Sterling had less than "marked" limitations in the relevant areas of functioning. Dr. Barclay indicated that he had reviewed Dr. Kabir's progress notes and that he disagreed with Dr. Kabir's GAF rating of 50. According to Dr. Barclay, the present record did not reflect such significant limitations. Dr. Barclay also disagreed with Dr. Reeves's GAF rating of 59, which, he said, indicated a relatively mild impairment. This rating, Dr. Barclay explained, was inconsistent with the November 6, 2000, medical source statement, in which Dr. Reeves opined that Sterling had no useful ability to function in many work-related areas. In addition, Dr. Barclay noted that the teacher reports in the record were not current and were inconsistent with Hudson's testimony regarding Sterling's improved academic performance. In Dr. Barclay's opinion, Hudson's testimony "suggest[ed] that [Sterling is] able to maintain attention in the classroom and to concentrate on tasks presented to him in order to achieve a better than average level of function in the academic environment." Considering the record as a whole, Dr. Barclay opined that a GAF rating in the range of 70-75 would be appropriate. In summarizing Dr. Barclay's testimony, the ALJ noted Dr. Barclay's belief "that [Sterling] had a longitudinal history of improvement in behavior and academic functioning."

Relying in part on Dr. Barclay's testimony, the ALJ concluded that Sterling was not disabled. After exhausting her administrative remedies, Hudson filed a complaint pursuant to 42 U.S.C. § 405(g), challenging the ALJ's reliance on Dr. Barclay's testimony and the adequacy of the evidence supporting the ALJ's disability determination. Concluding that substantial evidence supported this determination, the district court dismissed the complaint.

## II. Analysis

As we recently noted, "[t]here are many ways to demonstrate that a child is disabled." Collins v. Barnhart, 335 F.3d 726, 729 (8th Cir. 2003) (citing 20 C.F.R. § 416.926a(b) (1999)). As in Collins, only one of these ways is at issue in this appeal. Had the ALJ found that Sterling's impairments resulted in an "extreme" limitation in one functional area, or "marked" limitations in two functional areas, Sterling would have been entitled to benefits. 20 C.F.R. § 416.926a(a) (2003).[3] The six relevant functional areas are (1) acquiring and using information, (2) attending and completing tasks, (3) interacting and relating with others, (4) moving about and manipulating objects, (5) caring for oneself, and (6) health and physical well-being. 20 C.F.R. § 416.926a(b)(1). Hudson's appeal concerns only the second and third areas.

Hudson first contends that Dr. Barclay failed to testify in accordance with Social Security guidelines in that he explicitly stated that he was considering Sterling's level of functioning within the special education setting, and not in comparison to children without impairments, as required by the applicable regulations. See 20 C.F.R. § 416.924a(b)(3)(i) (2003) ("Information about what you can and cannot do, and how you function on a day-to-day basis at home, school, and in the community, allows us to compare your activities to the activities of children your age who do not have impairments."); see also id. § 416.924a(b)(7)(iv) ("[W]e will consider that good performance in a special education setting does not mean that you are functioning at the same level as other children your age who do not have impairments."). Hudson also asserts that Dr. Barclay's response to a particular question by her counsel demonstrated that he was not applying the definitions of "marked" and "extreme" that are set forth in the regulations. Thus, Hudson

_____

[3]As did the ALJ and the district court, we set forth the most current standards in evaluating Sterling's impairments.

concludes, Dr. Barclay's opinions were founded upon "misinterpretations or misapplications of Social Security law."

The passages cited by Hudson do not persuade us that Dr. Barclay's testimony was inconsistent with the applicable regulations. With respect to the first passage, Dr. Barclay's responses simply were not as explicit as Hudson contends and reflect, at most, confusion stemming from counsel's form of questioning. As for the second passage, Dr. Barclay's statements indicated that he was not responding to counsel's hypothetical as Hudson suggests; rather, he was explaining his reasons for concluding that Sterling's limitations were less than marked.

Next, Hudson contends that by "contradicting" the medical evidence in the record, rather than "interpreting or explaining" it, Dr. Barclay "supplanted the evidence of record with his own opinions." Again, we disagree. As discussed above, Dr. Barclay outlined why Dr. Reeves's assessments were inconsistent with one another. He also emphasized Hudson's testimony regarding Sterling's recent academic progress. This testimony, Dr. Barclay explained, suggested that Sterling's current limitations were not as significant as either Dr. Reeves's or Dr. Kabir's GAF ratings indicated. Thus, we are satisfied that Dr. Barclay did just what he was retained to do--aid the ALJ in evaluating the medical evidence. We therefore cannot agree that Dr. Barclay was called merely "to create his own evidence," as Hudson contends.

Hudson also argues that the ALJ failed to weigh the medical experts' opinions properly. The record belies this contention. Initially, we note that the ALJ did not, as Hudson suggests, rely solely on Dr. Barclay's testimony in finding that Sterling was not disabled. As the district court noted, the ALJ addressed the reports and findings of all the medical professionals at length. In doing so, the ALJ observed several inconsistencies, noting that the medical evidence varied as to whether Sterling had ADHD. The ALJ also noted "considerable inconsistencies" between the

narrative portion of Dr. Reeves's report and his functional assessments. Finally, the ALJ agreed that the GAF ratings assigned by the various treating and examining providers did not appear to reflect Sterling's current abilities, given Hudson's testimony during the hearings. In short, the well-drafted administrative decision demonstrates that the ALJ considered all of the medical evidence, including Dr. Barclay's testimony, weighed this evidence in accordance with the applicable standards, and attempted to resolve the various conflicts and inconsistencies in the record. This is precisely what an ALJ is instructed to do. See Bentley v. Shalala, 52 F.3d 784, 785 (8th Cir. 1995) ("It is the ALJ's function to resolve conflicts among 'the various treating and examining physicians.'" (citations omitted)); Cantrell v. Apfel, 231 F.3d 1104, 1107 (8th Cir. 2000) (discussing an ALJ's role in resolving conflicts among medical opinions); 20 C.F.R. § 416.927(d) (2003) (outlining how medical opinions are to be weighed). Finally, there is nothing in the ALJ's decision indicating that Dr. Barclay's opinion was afforded more weight than it was due under the regulations. We find it significant that Dr. Barclay was the only witness to offer an opinion based on the record as a whole, including Sterling's medical records, his educational records, and Hudson's testimony. See, e.g., 20 C.F.R. § 416.927(d)(3) ("[B]ecause nonexamining sources have no examining or treating relationship with you, the weight we will give their opinions will depend on the degree to which they provide supporting explanations for their opinions. We will evaluate the degree to which these opinions consider all of the pertinent evidence in your claim, including opinions of treating and other examining sources."). Accordingly, we are satisfied that the ALJ properly weighed the medical opinions in the record.

Hudson concludes by challenging the sufficiency of the evidence underlying the ALJ's findings. According to Hudson, "[t]he medical evidence supports only [one] conclusion"--that Sterling suffers at least marked limitations in the two disputed functional areas. "Our scope of review is narrow; we must affirm the Commissioner's decision so long as it conforms to the law and is supported by substantial evidence on the record as a whole." Collins, 335 F.3d at 729 (citation omitted). "Substantial

evidence is less than a preponderance, but enough that a reasonable mind might find adequate to support the ALJ's conclusion." Id. (citation omitted).

With respect to the first area at issue, attending and completing tasks, the Commissioner considers "how well [the child is] able to focus and maintain [his] attention, and how well [he] begin[s], carr[ies] through, and finish[es] [his] activities, including the pace at which [he] perform[s] activities and the ease with which [he] change[s] them." 20 C.F.R. § 416.926a(h). In concluding that Sterling's limitations were less than marked in this area, the ALJ noted that the medical opinions varied as to whether Sterling had ADHD. The ALJ also recognized that although Sterling's seventh grade teacher had reported that Sterling had had some difficulties with beginning and completing assignments, Hudson's testimony suggested improvement in these areas. The ALJ then noted (1) psychologist Sklar's opinion that Sterling was capable of understanding and remembering simple instructions and would not have difficulty with tasks requiring sustained concentration and persistence, and (2) Dr. Reeves's narrative report, in which he, too, opined that Sterling was able to sustain concentration and persistence on tasks. Finally, the ALJ observed, based on Hudson's testimony it appeared that Sterling was able to sustain attention sufficiently to obtain above-average grades in his self-contained classroom setting. Although Dr. Reeves's functional assessments indicated that Sterling's limitations were more severe, the ALJ properly discounted these assessments, and the evidence was sufficient to support the ALJ's finding that Sterling had less than marked limitations in the area of attending and completing tasks.

With regard to the second area at issue, interacting and relating with others, the ALJ noted that although Sterling had a history of relatively minor disciplinary infractions at school, Hudson testified regarding the recent improvements in his behavior. The ALJ also cited the teacher report in which Sterling was described as the "class clown," whom other students generally liked. In addition, the ALJ observed that (1) Sterling was able "to communicate with others," (2) he had not

-11-

engaged in any high risk or dangerous behavior, and (3) his depression had improved with medication. This evidence supports the ALJ's finding that Sterling's limitations in the area of interacting and relating with others were less than marked.

### III.  Conclusion

Substantial evidence on the record as a whole supports the decision of the Commissioner.  Accordingly, the judgment is affirmed.

_____