# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 09-3263

_____

Jerri Jones,

        Appellant,

v.

Michael J. Astrue, Commissioner,
Social Security Administration,

        Appellee.

\*
\*
\*
\*   Appeal from the United States
\*   District Court for the
\*   Eastern District of Arkansas.
\*
\*
\*
\*

_____

Submitted: June 17, 2010
Filed: August 31, 2010

_____

Before SMITH and HANSEN, Circuit Judges, and WEBBER,[1] District Judge.

_____

SMITH, Circuit Judge.

Jerri Jones appeals the district court's[2] judgment upholding the Commissioner of Social Security's denial of her application for disability insurance benefits and supplemental security income. Jones argues that this court should reverse the

---

[1]The Honorable E. Richard Webber, United States District Judge for the Eastern District of Missouri, sitting by designation.

[2]The Honorable Beth M. Deere, United States Magistrate Judge for the Eastern District of Arkansas, to whom the case was referred for final disposition by consent of the parties pursuant to 28 U.S.C. § 636(c).

administrative law judge's (ALJ) denial of benefits because (1) the ALJ failed to properly develop the record and consider whether Jones's restrictive pulmonary disorder meets a listing; (2) the ALJ's residual functional capacity (RFC) assessment omitted Jones's mental restrictions and was based on an improper credibility assessment; and (3) the vocational expert's (VE) response to the ALJ's hypothetical identified jobs that went beyond the restrictions stated in the hypothetical without providing a sufficient explanation for the variation. We affirm.

## I. *Background*

Jones sought benefits, claiming disability due to anxiety, depression, pain, and shortness of breath. At the time of the ALJ's decision, Jones was 47 years old and living with her husband and niece. She is a high school graduate and holds a Licensed Practical Nurse (LPN) degree. Her past relevant work experience includes being an LPN and a property manager.

The ALJ followed the required five-step sequence to determine whether Jones was entitled to benefits. *See* 20 C.F.R. §§ 404.1520(a)-(g); 416.920(a)-(g). The ALJ found that Jones had not engaged in substantial gainful activity since the alleged onset date of April 21, 2004. He also found that Jones suffered from arthralgias, polyneuropathy, degenerative disc disease, migraine headaches, hypothyroidism, carpal tunnel syndrom, diabetes mellitus, anxiety disorder, and depressive disorder (NOS). After reviewing the medical exhibits, the ALJ concluded that Jones suffers from a severe impairment within the meaning of the Social Security Regulations but that Jones did not have a "listed" impairment or combination of impairments.

The ALJ then considered whether Jones had the RFC to perform her past work. After considering the medical records and witness testimony, the ALJ found that Jones was not "disabled" and therefore not entitled to benefits. According to the ALJ, "[Jones's] subjective allegations [were] not borne out by the overall evidence and [were] found not to be fully credible to the extent alleged." Based on the VE's

testimony, the ALJ also concluded that although Jones is unable to perform her past relevant work as an LPN and property manager, a significant number of jobs in the national economy exist that Jones could perform.

Jones appealed the ALJ's denial of her claim for disability insurance benefits and supplemental security income to the district court, claiming that the ALJ's findings were not supported by substantial evidence on the record as a whole because (1) the ALJ failed to develop the record regarding her restrictive lung disease; (2) the ALJ posed a hypothetical question to the VE that did not include all of Jones's limitations; and (3) the VE's testimony was improper because the VE failed to explain a contradiction with the Dictionary of Occupational Titles (DOT). The district court rejected Jones's arguments. First, the district court held that there was no need for the ALJ to further develop the record because ample medical evidence existed in the record for the ALJ to decide whether Jones was disabled, the evidence supported the ALJ's determination that Jones's restrictive pulmonary disease could be controlled by medication and lifestyle changes, and Jones did not meet a listing. Second, the district court concluded that substantial evidence in the record supported the ALJ's conclusion that Jones had the RFC to perform sedentary work with a fair ability to interact with others in the workplace and that the ALJ properly found that Jones's subjective allegations of pain were not fully credible. Finally, the district court found that the VE's testimony sufficiently supported the ALJ's determination that Jones was not disabled because the VE explained the inconsistency between his testimony and the DOT.

## II. *Discussion*

On appeal, Jones argues that this court should reverse the ALJ's decision for three reasons: (1) the ALJ failed to properly develop the record and consider whether Jones's restrictive pulmonary disease meets a listing; (2) the ALJ's RFC assessment, which he incorporated into the hypothetical that he posed to the VE, erroneously omits Jones's mental restrictions and is based on an improper credibility assessment; and (3)

the VE's response to the hypothetical question identified jobs beyond the restrictions stated in the hypothetical, and the VE failed to provide a sufficient explanation for the variation.

"This court reviews de novo a district court decision upholding the denial of social security benefits." *Kluesner v. Astrue*, 607 F.3d 533, 536 (8th Cir. 2010) (internal quotations and citation omitted). We "will uphold the Commissioner's decision if it is supported by substantial evidence on the record as a whole." *Id.* (internal quotations and citation omitted). We define "substantial evidence" as "less than a preponderance but . . . enough that a reasonable mind would find it adequate to support the conclusion." *Id.* (internal quotations and citation omitted). We must therefore "consider the evidence that supports the Commissioner's decision as well as the evidence that detracts from it." *Id.* (internal quotations and citation omitted). We may not reverse the Commissioner merely because "we would have come to a different conclusion." *Id.* (internal quotations and citation omitted). We must affirm the Commissioner's denial of benefits if, after reviewing the record, "we find it possible to draw two inconsistent positions from the evidence and one of those positions represents the Commissioner's findings." *Id.* (internal quotations and citation omitted).

In the present case, "the ALJ applied the five-step sequential evaluation in the social security regulations." *Id.* (citing 20 C.F.R. § 404.1520(a)(4)(i)-(v) (disability insurance benefits); 20 C.F.R. § 416.920(a)(4)(i)-(v) (supplemental security income); *Bowen v. Yuckert*, 482 U.S. 137, 140–42 (1987); *Robson v. Astrue*, 526 F.3d 389, 392 (8th Cir. 2008)). Under this five-step process,

> [t]he ALJ first determines if the claimant is engaged in substantial gainful activity. If so, the claimant is not disabled. Second, the ALJ determines whether the claimant has a severe medical impairment that has lasted, or is expected to last, at least 12 months. Third, the ALJ considers the severity of the impairment, specifically whether it meets or

equals one of the listed impairments. If the ALJ finds a severe impairment that meets the duration requirement, and meets or equals a listed impairment, then the claimant is disabled. However, the fourth step asks whether the claimant has the residual functional capacity to do past relevant work. If so, the claimant is not disabled. Fifth, the ALJ determines whether the claimant can perform other jobs in the economy. If so, the claimant is not disabled.

*Id.* at 537.

## A. *Adequate Development of the Record*

Jones first argues that the ALJ erred at the third step of the five-step evaluation by finding that she has the RFC to perform sedentary work because she suffers from restrictive lung disease with asthma. According to Jones, pulmonary function tests performed in January 2007 revealed a forced expiratory volume ($FEV_1$) of 1.57 or 54 percent of predicted value; and, in February 2007, she was treated at the emergency room for difficulty breathing, where faint wheezing was noted bilaterally. She was diagnosed with chronic obstructive pulmonary disease (COPD). As a result, Jones maintains that her pulmonary function testing indicates an impairment that is close to the listing level severity for chronic pulmonary insufficiency under 20 C.F.R. Part 404, Subpart. P, Appendix 1, § 3.02(A). She notes that Dr. Henry K. Hamilton, a consulting, board-certified orthopedic surgeon, testified that while in his opinion Jones did not meet a listing because of her orthopedic problem, it was possible that she met a listing for pulmonary impairment; however, she claims that the ALJ never investigated whether she met this listing. Jones also argues that if the record was unclear regarding whether she met a listing for chronic pulmonary insufficiency, the ALJ was obligated to recontact her doctors for additional evidence or clarification; therefore, the ALJ should have ordered a consultative medical examination with complete pulmonary function testing.

"A disability claimant is entitled to a full and fair hearing under the Social Security Act." *Halverson v. Astrue*, 600 F.3d 922, 933 (8th Cir. 2010) (internal quotations and citation omitted). Where "the ALJ's determination is based on all the evidence in the record, including the medical records, observations of treating physicians and others, and an individual's own description of his limitations," the claimant has received a "full and fair hearing." *Id.* (internal quotations and citation omitted). "The ALJ is required to order medical examinations and tests only if the medical records presented to him do not give sufficient medical evidence to determine whether the claimant is disabled." *Id.* (internal quotations and citation omitted).

> While the ALJ has an independent duty to develop the record in a social security disability hearing, the ALJ is not required "to seek additional clarifying statements from a treating physician unless a crucial issue is undeveloped." *Stormo* [*v. Barnhart*], 377 F.3d [801,] 806 [(8th Cir. 2004)]. The Commissioner's regulations explain that contacting a treating physician is necessary only if the doctor's records are "inadequate for us to determine whether [the claimant is] disabled" such as "when the report from your medical source contains a conflict or ambiguity that must be resolved, the report does not contain all the necessary information, or does not appear to be based on medically acceptable clinical and laboratory diagnostic techniques." 20 C.F.R. §§404.1512(e), 416.912(e).

*Goff v. Barnhart*, 421 F.3d 785, 791 (8th Cir. 2005).

"For a claimant to show that his impairment matches a listing, it must meet *all* of the specified medical criteria." *Brown ex rel. Williams v. Barnhart*, 388 F.3d 1150, 1152 (8th Cir. 2004) (internal quotations and citation omitted). Furthermore, the question is whether the ALJ "consider[ed] evidence of a listed impairment and concluded that there was no showing on th[e] record that the claimant's impairments . . . m[et] or are equivalent to any of the listed impairments." *Karlix v. Barnhart*, 457 F.3d 742, 746 (8th Cir. 2006) (internal quotations omitted). "The fact that the ALJ

d[oes] not elaborate on this conclusion does not require reversal [where] the record supports h[is] overall conclusion." *Id.*

Here, 20 C.F.R. Part 404, Subpart. P, Appendix 1, § 3.02(A) requires that, for Jones to meet the listing for chronic pulmonary insufficiency, her $FEV_1$ must be 1.35 or less.[3] Jones admits that pulmonary function tests performed in January 2007 revealed an $FEV_1$ of 1.57 or 54 percent of predicted value. And, even though the ALJ did not specifically mention § 3.02(A), he did consider evidence of the purported impairment, stating:

> The claimant has alleged disability due to chronic obstructive pulmonary disease (COPD), asthma, and bronchitis. She presented to the Regional Medical Center of NEA on December 18, 2004, with complaints of shortness of breath. She was diagnosed with bronchitis and given medication and discharged. No aggressive intervention or definitive diagnostic testing was done (Exhibit 2F).
>
> X-rays of the claimant's chest done October 11, 2005, was noted as a negative study. CT of her chest done March 21, 2006, is supportive that Dr. Nicell felt it was a normal study (Exhibits 8F, 14F).
>
> The claimant presented to St. Bernard's Medical Center on January 18, 2007, with complaints of cough and shortness of breath; however, x-rays of her chest were noted "essentially negative examination. Stable-appearing since the prior study" (Exhibit 14F). The claimant had a pulmonary function test on January 24, 2007, at St. Bernard's Medical Center supportive of moderate to severe restricted defect with a FEC of 1.89 or 50% of predicted value (Exhibit 14F). She was diagnosed with dyspnea and chronic obstructive pulmonary disease (COPD) on February 2, 2007. Radiology report dated February 2, 2007, noted no acute disease seen and history of asthma and shortness of breath (Exhibit 12F).

---

[3]We note that the district court stated that for Jones to meet the listing for chronic pulmonary insufficiency, her $FEV_1$ had to be 1.45 or less. Under either calculation, Jones has failed to meet the listing.

The claimant was seen by Dr. Linda Gilliam on January 18, 2007, for complaints of shortness of breath and treated with Duoneb which resolved her wheezing (Exhibit 18F). She was put on several medications and counseled to use gum or lozenges if necessary, but to absolutely quit smoking (Exhibit 18F). Her diagnosis was asthma (NOS). Chest was clear to auscultation and noted as symmetric expansion and no dullness in percussion on February 5, 2007. She was diagnosed with restrictive pulmonary disease on this date and again counseled to quit smoking and to avoid secondary smoke.

Follow-up records from Dr. Gilliam dated January 18, 2008, are supportive of good results from her treatment. Chest inspection was symmetric expansion, no percussion dullness, no tenderness to palpation, rare late expiratory wheeze with forced expiration, no rhonchi or rales, and peripheral vascular system pulses 2+ and symmetrical (Exhibit 19F).

I find that a reasonable conclusion can be reached that the frequency, intensity, and duration of the claimant's pulmonary symptomatology is fairly well controlled with medication and would not more than minimally affect her ability to carry on gainful activity at the sedentary exertional level.

In light of Dr. Gilliam's reports, the ALJ had no need to contact Dr. Gilliam, the treating physician, because there was no ambiguity to resolve in her reports, and the report contained all the necessary information, including the results of diagnostic testing. Furthermore, Dr. Gilliam reported on January 18, 2008, that treatment was yielding good results, and she also stated that medication was resolving Jones's wheezing. Moreover, Dr. Gilliam counseled Jones *twice* to stop smoking. *See Kisling v. Chater*, 105 F.3d 1255, 1257 (8th Cir. 1997). There is also no evidence in the record that Dr. Gilliam ever "restricted [Jones's] activities because of her pulmonary status." *Id*.

And, Dr. Hamilton's opinion that it was "possible" that Jones met a listing with her pulmonary impairment is not controlling because Dr. Hamilton is an orthopedic

specialist not qualified to make conclusions regarding chronic pulmonary insufficiency.

Therefore, ample evidence exists in the record to support the ALJ's conclusion that Jones's restrictive pulmonary disease was not an "impairment" matching a listing for chronic pulmonary insufficiency.

## B. *RFC Assessment*

Jones next challenges the ALJ's determination at step five that there is other work in the economy that Jones can perform. The ALJ found that Jones had the RFC to perform sedentary work and, based on the VE's testimony, concluded that she is not disabled because there is other work in the economy that she can perform. According to Jones, her RFC is more limited than the ALJ found because the ALJ (1) failed to include restrictions that describe the effects of her mental impairments and (2) erred in assessing her credibility.

> If a claimant does not suffer from a listed impairment or its equivalent, the analysis proceeds to steps four and five. Step four requires the ALJ to consider whether the claimant retains the RFC to perform her past relevant work. The claimant bears the burden of demonstrating an inability to return to her past relevant work. If the ALJ determines the claimant cannot resume her prior occupation, the burden shifts to the Commissioner at step five to show the claimant is capable of performing other work.

*Pate-Fires v. Astrue*, 564 F.3d 935, 942 (8th Cir. 2009) (internal citations omitted).

> At this stage, the ALJ must determine the claimant's residual functional capacity (RFC), that is, what she can still do physically even with her impairments, and also the claimant's age, education, and relevant work experience—the latter three findings being referred to as vocational factors, as opposed to RFC, which is a medical factor. If the ALJ's

findings as to RFC, age, education, and work experience fit any of the combinations of those criteria contained in the Tables in Appendix 2 to Part 404, then the ALJ must reach the conclusion (either disabled or not disabled) directed by the relevant Rule or line of the applicable Table.

*Reed v. Sullivan*, 988 F.2d 812, 815–16 (8th Cir. 1993) (internal quotations, alterations, and citations omitted). "[T]he record must include some medical evidence that supports the ALJ's residual functional capacity finding." *Dykes v. Apfel*, 223 F.3d 865, 867 (8th Cir. 2000). "It is the ALJ's responsibility to determine claimant's RFC based on all the relevant evidence, including medical records, observations of treating physicians and others, and claimant's own description of her limitations." *Page v. Astrue*, 484 F.3d 1040, 1043 (8th Cir. 2007) (internal quotations, alterations, and citations omitted).

"Generally, if the claimant suffers from nonexertional impairments that limit her ability to perform the full range of work described in one of the specific categories set forth in the guidelines, the ALJ is required to utilize testimony of a vocational expert." *Reed*, 988 F.2d at 816. "Testimony based on hypothetical questions that do not encompass all relevant impairments cannot constitute substantial evidence to support the ALJ's decision. Hypothetical questions should set forth impairments supported by substantial evidence on the record and accepted as true and capture the concrete consequences of those impairments." *Hillier v. Soc. Sec. Admin.*, 486 F.3d 359, 365 (8th Cir. 2007) (internal quotations, alterations, and citations omitted).

### 1. *Mental Impairments*

Jones argues that the ALJ failed to include restrictions in the hypothetical that describe the effects of her mental impairments, as she has struggled with depression and anxiety, been treated on numerous occasions by both her primary care physicians and by mental health professionals, undergone extensive medical therapy, and attended several individual therapy sessions. Jones relies on the statement of her treating psychiatrist, Dr. David Erby, that she suffers from an anxiety disorder with

panic and a depressive disorder. According to Jones, Dr. Erby certified that she meets the criteria for a serious mental illness. Also, she notes that throughout her treatment, both Dr. Erby and her therapist have assigned her Global Assessment Functioning (GAF) scores ranging from the mid-40s to the low-50s.

As the district court found, the record reflects that the ALJ adequately reviewed all the relevant evidence concerning Jones's alleged disability due to anxiety and depression, as he

> appropriately considered not only Dr. Erby's diagnosis but also the records of [Jones's] other treating physicians, her social worker, her testimony, and her activities of daily living. He acknowledged that [Jones] is "somewhat a recluse and avoids the public by choice; however, the record is not supportive that she cannot act in a socially acceptable manner when properly motivated to do so." The ALJ noted that [Jones] used to work as an LPN and, after her mother died, she cared for her father and niece. [Jones] claimed social isolation but in November, 2006, she told [her therapist] a "friend" checked on her and took her to the hospital. Further, in September, 2007, just a month before her October, 2007 hearing, [Jones] met and married her husband.

(Internal citations omitted.) Based on the evidence, the ALJ determined that "the frequency, intensity, and duration of the claimant's mental symptomatology would not more than minimally affect her ability to carry on gainful activity at the unskilled and semiskilled sedentary exertional level." Like the district court, we find that "[t]he ALJ's conclusion that [Jones] had the RFC to perform sedentary work with a fair ability to interact with others in the workplace is supported by substantial evidence in the record."

Jones is correct that Dr. Erby did (1) opine that Jones suffers from anxiety disorder, with panic, and depressive disorder and (2) certify that Jones meets the criteria for a functional impairment for an adult with a serious mental illness. But the

record also reflects that, during Jones's treatment, Dr. Erby on certain occasions questioned whether Jones's anxiety was "contrived." On October 2, 2006, Dr. Erby stated:

> She is displaying quite a dramatic picture of anxiety today with wringing her hands and bouncing her legs. It's difficult to estimate whether this is contrived. She is filing for disability based on her anxiety symptoms in part. She talks about being house bound, that the only place where she can come is the doctor's office and she doesn't enjoy that of course. It's impossible to evaluate her sincerity.

And, on October 27, 2006, Dr. Erby observed the following:

> She was coming in after a lengthy absence. She was disability oriented. She was demonstrating dramatic anxiety with wringing of her hands and bouncing her legs. She was talking about the discomfort in the doctor's office and in the waiting room. Today she was sitting in the waiting room calmly reading a book and showed no overt anxiety. She didn't mention anxiety and talked a lot about depression. She showed no obvious distress but did not smile either. We talked about several options including increasing the Lexapro, adding another agent, or substituting another agent. We eventually decided to increase the Lexapro. It is difficult to evaluate her sincerity due to the disability application and her probable dramatic exaggeration of anxiety.

Given Dr. Erby's comments about "probable dramatic exaggeration of anxiety," "[t]he ALJ was entitled to draw conclusions about [Jones's] credibility based on [Dr. Erby's observation] indicating that [Jones] was exaggerating symptoms . . . ." *Baker v. Barnhart*, 457 F.3d 882, 892 (8th Cir. 2006) (citing *Clay v. Barnhart*, 417 F.3d 922, 930 n. 2 (8th Cir. 2005) (noting that two psychologists' findings that the claimant was "malingering" on her IQ tests cast suspicion on the claimant's motivations and credibility); *Jones v. Callahan*, 122 F.3d 1148, 1152 (8th Cir. 1997) (holding that a physician's observation "of the discrepancies in [the claimant's] appearance in the

-12-

examining room and those outside when he did not know that he was observed" supported an ALJ's finding that the claimant's complaints were not fully credible)).

Furthermore, Jones's reliance on Dr. Erby's GAF scoring of her in the mid-40s and lower 50s as implicating "impairment in social, occupational, or social functioning" is unavailing.

"The [Global Assessment Functioning] score is a subjective determination that represents 'the clinician's judgment of the individual's overall level of functioning.'" *Wesley v. Comm'r of Soc. Sec.*, No. 99-1226, 2000 WL 191664, at *3 (6th Cir. Feb. 11, 2000) (quoting *Diagnostic and Statistical Manual of Mental Disorders* 30 (4th ed. 1994)). [The Sixth Circuit has] previously held that the failure to reference a Global Assessment Functioning score is not, standing alone, sufficient ground to reverse a disability determination. *Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235, 241 (6th Cir. 2002) (While a Global Assessment Functioning score may be of "considerable help," it is not "essential" to determining an individual's residual functional capacity.); *see also Kornecky v. Comm'r of Soc. Sec.*, No. 04-2171, 2006 WL 305648, at *13–*14 (6th Cir. Feb. 9, 2006) ("[A]ccording to the [Diagnostic and Statistical Manual's] explanation of the [Global Assessment Functioning] scale, a score may have little or no bearing on the subject's social and occupational functioning . . . . [W]e are not aware of any statutory, regulatory, or other authority requiring the ALJ to put stock in a [Global Assessment Functioning] score in the first place.")

Moreover, the Commissioner "has declined to endorse the [Global Assessment Functioning] score for 'use in the Social Security and [Supplemental Security Income] disability programs,' and has indicated that [Global Assessment Functioning] scores have no 'direct correlation to the severity requirements of the mental disorders listings.'" *Wind v. Barnhart*, No. 04-16371, 2005 WL 1317040, at *6 n. 5, 133 Fed. Appx. 684 (11th Cir. June 2, 2005) (quoting 65 Fed. Reg. 50746, 50764-65 (Aug. 21, 2000)). Accordingly, [the Sixth Circuit has] affirmed denials of disability benefits where applicants had Global Assessment Functioning scores of 50 or lower. *See, e.g.*, *Smith v. Comm'r of Soc.*

*Sec.*, No. 02-1653, 2003 WL 22025046, 74 Fed. Appx. 548 (6th Cir. Aug. 27, 2003) (Global Assessment Functioning score of 48); *Nierzwick v. Comm'r of Soc. Sec.*, 7 Fed. Appx. 358 (6th Cir. 2001) (Global Assessment Functioning score of 35); *Thurman v. Apfel*, 211 F.3d 1270 (6th Cir. 2000) (Global Assessment Functioning score of 50).

*DeBoard v. Comm'r of Soc. Sec.*, 211 F. App'x 411, 415 (6th Cir. 2006) (unpublished).

As the district court correctly observed, "an ALJ may afford greater weight to medical evidence and testimony than to GAF scores when the evidence requires it." (Citing *Hudson ex rel. Jones v. Barnhart*, 345 F.3d 661, 666 (8th Cir. 2003) ("Finally, the ALJ agreed that the GAF ratings assigned by the various treating and examining providers did not appear to reflect Sterling's current abilities, given Hudson's testimony during the hearings."))[4] Moreover, the record demonstrates that the ALJ

[4]Jones asserts that GAF scores are essential to the accuracy of the RFC assessment, citing *Pate-Fires*, a case also implicating Dr. Erby's opinion. *Pate-Fires* is distinguishable from the present case because, in that case, the record reflected a *lengthy* history of GAF scores for the claimant. 564 F.3d at 944. We concluded that

> [t]he total GAF score history indicates [the claimant] was above 50 only four out of twenty-one times in a six-year period. The ALJ failed to discuss or consider the *many GAF scores below 50, including scores as low as 10 and 20*. The history of GAF scores at 50 or below, taken as a whole, indicate [the claimant] has "[s]erious symptoms . . . or any serious impairment in social, occupational or school functioning . . . ."

*Id.* (quoting Diagnostic and Statistical Manual of Mental Disorders, 32 (4th ed. Am. Psychiatric Ass'n 1994)) (emphasis added).

Here, Jones has not presented a "GAF score history" indicating that she was at or below a GAF of 50 on several occasions. Furthermore, unlike in *Pate-Fires*, Dr. Erby's assigning of a GAF of 50 is undercut by his prior comments about "probable dramatic exaggeration of anxiety" on Jones's part due to her disability filing. And, the ALJ explained *why* it was discrediting the findings of Mid South Health System. Also,

-14-

in the present case "addressed the reports and findings of all the medical professionals at length. In doing so, the ALJ observed several inconsistencies" in the treatment records of Mid South Health System, the institution where Jones received treatment. *Id*. The ALJ considered these inconsistencies in concluding that "[t]his institution simply does not assess for credibility concerning any alleged diagnoses and little weight is given to any of their opinions outside of their expertise, mental health."

### 2. *Credibility*

Jones alleges that the ALJ erroneously dismissed her testimony based on a "supposed inconsistency" with the medical evidence. According to Jones, the ALJ questioned her activities solely in light of the medical evidence and failed to identify any conflicts other than those with the medical evidence. Jones maintains that an ALJ may not disregard a claimant's subjective allegations of pain solely because they are not fully supported by objective medical evidence and that the ALJ's failure to properly consider the factors set forth in *Polaski v. Heckler*, 751 F.2d 943 (8th Cir. 1984), suggests that he rejected her complaints simply because he believed that they were not consistent with the medical evidence.

> We set forth the standard courts should follow when evaluating subjective complaints in *Polaski v. Heckler*, 739 F.2d 1320 (8th Cir. 1984). In *Polaski*, we held the ALJ must consider "the claimant's prior work history; daily activities; duration, frequency, and intensity of pain; dosage, effectiveness and side effects of medication; precipitating and aggravating factors; and functional restrictions." *Medhaug v. Astrue*, 578 F.3d 805, 816 (8th Cir. 2009) (citing *Polaski*, 739 F.2d at 1322). Another

unlike in *Pate-Fires* where this court found that Dr. Erby's findings did not actually conflict with the consulting psychiatrist's findings, the ALJ here relied heavily on Jones's actual daily activities, such as caring for her father, in reaching its conclusions. Finally, the court in *Pate-Fires did not* reference 65 Federal Regulation 50746, 50764–65 (August 21, 2000), in which the Commissioner declined to endorse the GAF scales to evaluate Social Security claims because the scales do not have a direct correlation to the severity requirements in mental disorders listings.

factor to be considered is the absence of objective medical evidence to support the complaints, although the ALJ may not discount a claimant's subjective complaints solely because they are unsupported by objective medical evidence. *Mouser v. Astrue*, 545 F.3d 634, 638 (8th Cir. 2008). The ALJ is not required to discuss each *Polaski* factor as long as "he acknowledges and considers the factors before discounting a claimant's subjective complaints." *Moore v. Astrue*, 572 F.3d 520, 524 (8th Cir. 2009) (citing *Goff*, 421 F.3d at 791).

*Halverson*, 600 F.3d at 931–32. "If an ALJ explicitly discredits the claimant's testimony and gives good reason for doing so, we will normally defer to the ALJ's credibility determination." *Id.* at 932 (internal quotations and citation omitted). "While an ALJ may not disregard subjective pain allegations solely because they are not fully supported by objective medical evidence, an ALJ is entitled to make a factual determination that a Claimant's subjective pain complaints are not credible in light of objective medical evidence to the contrary." *Baker*, 457 F.3d at 892–93 (internal quotations and citation omitted).

Our thorough review of the record reveals that the ALJ appropriately considered Jones's subjective complaints of pain under *Polaski*. As the district court observed, "[t]he ALJ considered [Jones's] daily activities, her medications, her demeanor at the hearing, *and* the inconsistency between [Jones's] complaints and the objective medical evidence." (Emphasis added.)

First, although Jones testified, according to the ALJ, that she

does not sleep at night due to pain and gets up 4 to 5 times in the night and walks around; wakes up tired; does not do errands alone; that she is not supposed to drive any more; that her daughter helps with the house work; and, she tries to do some of it, but gets to where she can't breathe and then has to lie down[,]

-16-

the ALJ found that Jones's activities "appear to be limited more on a self-imposed voluntary basis than as a result of any functional restrictions due to her impairments." The ALJ found Jones's claims contrary to her statement on August 29, 2006, that "she kept care of her father who was dependent on her for keeping the house and also reminding him about his diet, medications, etc." Further, the ALJ pointed out that during a psychological assessment on July 18, 2006, Jones stated that "she had other family problems that contributed to her not working."

Second, despite Jones's complaint of being anxious around people, a friend took her to the hospital on November 14, 2006, and she met and married her husband in September 2007.

Third, the ALJ noted that while Jones claimed to suffer from anxiety and panic attacks in public, her treating physician never placed any restriction on her being around people.

Fourth, the ALJ concluded that "the claimant record is supportive that when the claimant is compliant with her medication regime, her symptomatology is fairly well controlled to the point that she could do unskilled and semiskilled work activity."

Finally, the ALJ addressed a host of ailments that Jones complained of and concluded that the medical tests did not support the severity of her complaints.

## C. *VE's Response to the Hypothetical*

Finally, Jones asserts that the ALJ erroneously relied on the VE's testimony, which was not responsive to the ALJ's hypothetical. According to Jones, the hypothetical limited the VE's consideration to jobs that are sedentary in nature requiring only *occasional* handling. This limitation was based on Dr. Hamilton's testimony that Jones would be limited to sedentary work with only occasional use of her hands—repetitive and frequent repetitive actions with the hands would be

precluded. Jones asserts that the VE identified jobs that require frequent handling and failed to justify his answer.

Dr. Hamilton testified that, in his medical opinion, Jones "would be at the sedentary work level with some—only occasional use of her hands. If it's not repetitive or frequent repetitive actions with her hands, but only occasionally." Thereafter, the ALJ proposed the following hypothetical to the VE, stating:

> Let's assume a hypothetical individual that is 47 years of age with a high school education, degree in LPN and let's further assume that this individual can lift and carry up to 10 pounds *occasionally*, that the individual can stand or walk for a total of two hours in an eighty-hour work period, 30 minutes without interruption, this individual can sit for a total of six hours, two hours without interruption. Let's further assume the hypothetical individual can *occasionally* climb ladders, stairs and *occasionally* balance, stoop, crouch, kneel, crawl, this individual has no significant impairment in the ability to reach and only *occasionally* handle, no significant impairment in the ability to feel, push/pull 10 pounds, no impairments in ability to see, hear or speak, the individual could never work at heights due to medications taken, and or in areas of temperature extremes. Would there be jobs in the regional or national economy in which that hypothetical individual could perform?

(Emphasis added.) In response, the VE stated:

> Yes, Sir. I think that the jobs that I mentioned previously [calendar control clerk at a medical facility and patient insurance clerk, both sedentary positions] would still apply, but I think that they would—would be adjusted in the amount of their occurrences due to the limitation of only occasionally handle.

The VE then estimated that the amount of their occurrences would be reduced by ten to 15 percent. Jones's attorney then questioned the VE about the positions of calendar control clerk and patient insurance clerk, stating:

> On those—in the companion publication the selected characteristics, I think they—classify these jobs and breakdown the specific functions handling and fingering. What does the selected characteristics say about those two DOT numbers that you've given? Do they say that hand use is occasional, frequent, constantly?

The VE acknowledged that "hand and fingering is frequently used in these positions." Then, Jones's counsel clarified that "frequently" means "from one-third to two-thirds of the day," and the VE agreed. Counsel then asked whether "occasionally" meant "up to one-third of the day," and the VE answered in the affirmative. Next, counsel questioned the VE about the ALJ's hypothetical, and the following exchange occurred:

> Q.    Okay. Now, in the judge's hypothetical, I believe he said that the hypothetical person could only occasionally handle, is that right?
>
> A.    Yes.
>
> Q.    Is that what you understood?
>
> A.    But the fingering was—I think that—as I understood the hypothetical, it was occasionally handling, yes, but the feeling and other ones were within the normal limits. The only—I'm sorry, Counselor, the only one that I recognized was the occasional limitation in handling. So the reaching and fingering part were not identified.
>
> ***
>
> Q.    Now, first, then with the—the DOT says these jobs require frequent handling. So you're [sic] testimony, then is inconsistent with the DOT as far as being able to perform those jobs. Is that corr[ect]—is that?

-19-

A.     *Yes, Sir. I attempted to explain this. I thought there'd be a 10 or 15% reduction in those jobs because there was a restriction in handling, but not in the fingering and feeling part of it*, so these jobs would not be, I think as the doctor mentioned, it's not a rapid repetitive nature job as we know them. Such as small parts assembly are in the—where you're constantly having to finger, reach and feel. So, yes, it's not exactly as the DOT describes that specific part of this job. You're correct.

Q.     So the DOT doesn't say anything about constant on there because that's an entirely other category.

A.     Right.

Q.     And then—but it does—but doesn't say that, but it does say frequently for these positions?

A.     Yes.

Q.     And yet the limitation is occasionally . . . .

***

ALJ: Occasionally and handling. I didn't say anything about frequent—feeling or whatever you said there because I don't think that's significant.

***

A.     *The 10 or 15% adjustment in the poll numbers of the jobs that allow for that*. That would be my estimation of—

***

Q.     *But I just want to make sure. So that is how you explain the inconsistency between your testimony and the DOT?*

A.     *Yes, Sir.*

-20-

(Emphasis added.)

> [T]he Commission's own policy, SSR 00-4p, mandates: "When a [vocational expert] or [vocational specialist] provides evidence about the requirements of a job or occupation, the adjudicator has an affirmative responsibility to ask about any possible conflict between that [vocational expert] or [vocational specialist] evidence and the information provided in the [*Dictionary of Occupational Titles*]." The ALJ was required not only to ask the expert whether there was a conflict, but also to obtain an explanation for any such conflict. *Massachi v. Astrue*, 486 F.3d 1149, 1152 & n. 7 (9th Cir. 2007) (collecting cases).

*Renfrow v. Astrue*, 496 F.3d 918, 920–21 (8th Cir. 2007). Here, Jones's counsel brought the purported conflict to the ALJ's attention, and Jones does not contend on appeal that the ALJ erred in not initiating the inquiry. But

> "[a]n ALJ cannot rely on expert testimony that conflicts with the job classifications in the [Dictionary of Occupational Titles] unless there is evidence in the record to rebut those classifications." *Jones ex rel. Morris v. Barnhart*, 315 F.3d 974, 979 (8th Cir. 2003). The Dictionary of Occupational Title definitions "are simply generic job descriptions that offer the approximate maximum requirements for each position, rather than their range." *Wheeler v. Apfel*, 224 F.3d 891, 897 (8th Cir. 2000) (quoting *Hall v. Chater*, 109 F.3d 1255, 1259 (8th Cir. 1997)). "[N]ot all of the jobs in every category have requirements identical to or as rigorous as those listed in the [Dictionary of Occupational Titles]." *Id*.

*Hillier v. Soc. Sec. Admin.*, 486 F.3d 359, 366–67 (8th Cir. 2007).

> The DOT itself cautions that its descriptions may not coincide in every respect with the content of jobs as performed in particular establishments or at certain localities. In other words, not all of the jobs in every

category have requirements identical to or as rigorous as those listed in the DOT.

*Wheeler*, 224 F.3d at 897 (internal citations omitted); *accord Hall*, 109 F.3d at 1259 (holding that claimant could perform a number of jobs within the categories the VE listed—218 clerk jobs and 122 information clerk jobs in Arkansas—despite claimant's citation to the DOT "for the proposition that these jobs all require reaching, handling, or finger work" because DOT definitions are general job descriptions offering approximate maximum requirements for each position rather than their range).

Thus, "[w]hen VE testimony conflicts with the DOT, the DOT controls when the DOT classifications are not rebutted. The DOT classifications may be rebutted with VE testimony which demonstrates specific jobs whether classified as light or sedentary, may be ones that a claimant can perform." *Dobbins v. Barnhart*, 182 F. App'x 618, 619 (8th Cir. 2006) (unpublished per curiam) (internal quotations and citations omitted); *see also Hillier*, 486 F.3d at 367 (stating that a VE must "adequately respond[ ] to the hypothetical question posed by the ALJ"); *Porch v. Chater*, 115 F.3d 567, 572 (8th Cir. 1997) ("When expert testimony conflicts with the DOT, and the DOT classifications are not rebutted, the DOT controls.").

Here, the ALJ offered an explanation of the inconsistency between his testimony and the DOT. When the ALJ posed the hypothetical to the VE, the VE indicated that Jones could perform the sedentary positions of the calendar control clerk and patient insurance clerk but "that they would—would be adjusted in the amount of their occurrences due to the limitation of only occasionally handle." Additionally, the VE estimated, in his expert opinion, "a 10 or 15% reduction in those jobs because there was a restriction in handling, but not in the fingering and feeling part of it." "Because the vocational expert specifically limited his opinion to reflect sedentary work only (requiring [occasional handling]), his testimony was a perfectly

acceptable basis for the administrative law judge's conclusions." *Jones v. Chater*, 72 F.3d 81, 82 (8th Cir. 1995).

## III. *Conclusion*

Accordingly, we hold that substantial evidence on the record as a whole supports the ALJ's decision. We therefore affirm the judgment of the district court.

_____