KELLY, Circuit Judge,
dissenting.
In my view, the ALJ did not adequately identify and take into account the limitations imposed by the severe PTSD Hensley has suffered from since returning from deployment in Iraq, where he experienced mortar attacks. I would therefore remand this case to the district court with instructions to remand the case to the Social Security Administration for further consideration of the evidence concerning Hensley’s PTSD.
The court’s description of the medical evidence is accurate so far as it goes, but some additional facts are needed to complete the picture. Initially, Hensley’s GAF score, recorded at 51 in June 2011, had fallen to 41 as of August 2012. These assessments suggest that Hensley’s GAF score was in the 40-50 range during the disability period, a range that is generally incompatible with the ability to work. See Pate-Fires v. Astrue, 564 F.3d 935, 944 (8th Cir. 2009) (collecting cases). Yet the ALJ failed to even discuss these scores, much less explain how the limitations in *936 functioning they reflect were incorporated into the hypothetical he posed to the vocational expert.[5]
It is certainly true that “an ALJ may afford greater weight to medical evidence and testimony than to GAF scores when the evidence requires it.” Jones v. Astrue, 619 F.3d 963, 974 (8th Cir. 2010) (quotation omitted). But here the GAF scores are consistent with the medical evidence and testimony, not belied by them. Hensley’s wife reported in August 2012 that Hensley was unable to prepare meals because of his nervousness and the fact that he would lose focus on what he was cooking. He was unable to mow lawns without taking breaks every 10-15 minutes, resulting in his taking nearly five hours to complete the entire lawn. He didn’t feel comfortable going out alone without a family member, and according to his testimony before the ALJ, he hadn’t been to a football game in about two years due to the discomfort he felt around other people. He and his wife no longer went out to dinner together.[6]
None of these limitations were reflected in the ALJ’s hypothetical, which simply asked the vocational expert to opine on a person “[l]imited to simple routine and repetitive tasks with only incidental interpersonal contact in work where the supervision is simple, direct, and concrete.” “When a hypothetical question does not encompass all relevant impairments, the vocational expert’s testimony does not constitute substantial evidence.” Hunt v. Massanari, 250 F.3d 622, 626 (8th Cir. 2001). In fact, when Hensley’s attorney modified the hypothetical to specify a person who was significantly impaired in his ability to maintain concentration and focus,[7] the vocational expert testified that such a person *937 would be unable to perform any of the jobs she had listed in response to the ALJ’s hypothetical.
The court relies instead on a June 2012 assessment by Hensley’s primary-care physician, Dr. Richard McKelvey, that Hensley’s symptoms of PTSD and depression were “stable,” as well as testimony to the same effect from Hensley. See ante at 933-34. But to describe symptoms as “stable” is simply to state that they are not getting any better or worse; it says nothing about whether the symptoms are disabling. Cf. Cox v. Barnhart, 345 F.3d 606, 609 (8th Cir. 2003) (“It is possible for a person’s health to improve, and for the person to remain too disabled to work.”); Hutsell v. Massanari, 259 F.3d 707, 712 (8th Cir. 2001) (“[T]he Commissioner erroneously relied too heavily on indications in the medical record that [the claimant] was ‘doing well,’ because doing well for the purposes of a treatment program has no necessary relation to a claimant’s ability to work- or to her work-related functional capacity.”); Gude v. Sullivan, 956 F.2d 791, 794 (8th Cir. 1992) (holding that the fact that a physician reported that the claimant was “doing well” could mean that they were “doing well for someone with a kidney transplant,” not that they weren’t disabled). Indeed, immediately after Hensley testified that the medications made his condition “more stable,” he clarified that he didn’t feel he was getting any better. Nothing in Dr. McKelvey’s assessment is inconsistent with Hensley’s GAF scores and testimony, both of which point to his PTSD being disabling.
Accordingly, I would remand this case for further consideration.

. The court correctly notes that the GAF of 41 postdates Hensley's disability period, see ante at 933 n. 3, but Hensley's condition following the disability period can constitute evidence of his level of functioning during the disability period — which is presumably why the court relies on other information gathered in August 2012 to support its decision to deny disability benefits. See ante at 933-34; Pyland v. Apfel, 149 F.3d 873, 877 (8th Cir. 1998) ("Evidence of a disability subsequent to the expiration of one's insured status can be relevant, however, in helping to elucidate a medical condition during the time for which benefits might be rewarded.”); Poe v. Harris, 644 F.2d 721, 723 n. 2 (8th Cir. 1981) ("Evidence of an applicant's condition 'subsequent to the date upon which the earning requirement was last met is pertinent evidence in that it may disclose' the severity and continuity of impairments existing before the earning requirement date.... ’ ” (citation omitted)).

. The ALJ discounted Hensley's testimony because he dropped out of therapy sessions in 2010 and 2011, despite the fact that the testimony is consistent with his low GAF scores. There are any number of reasons why a claimant might not take advantage of treatment that do not bear on his credibility in addition to the specific ground recognized in Pate-Fires, 564 F.3d at 945—that the failure “was a medically-determinable symptom of [the claimant’s] mental illness.” See Charles W. Hoge, et al., PTSD Treatment for Soldiers after Combat Deployment: Low Utilization of Mental Health Care and Reasons for Dropout, 16 Psychiatric Services 997, 997-98 (Aug. 2014), http://dx.doi.org/10.1176/appi.ps. 201300307 (collecting evidence to suggest that therapy is underutilized for reasons including distrust or negative perceptions of care, perceptions of self-reliance, lack of availability, and stigma); Soc. Sec. Ruling 96-7p, 1996 WL 374186, at *7-*8 (1996) ("[T]he adjudicator must not draw any inferences about an individual’s symptoms and their functional effects from a failure to seek or pursue regular medical treatment without first considering any explanations that the individual may provide.”). The ALJ inquired only in the most cursory fashion about Hensley's reasons for not going to therapy, so it is not possible to determine whether those reasons reflect badly on his credibility or not.

.In his exact words, a person who "[c]ould not maintain concentration and focus with a marked restriction which would significantly impair the ability to do so, but it wouldn't be precluded.”