[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
JUNE 2, 2005
THOMAS K. KAHN
CLERK

No. 04-16371
Non-Argument Calendar
_____

D.C. Docket No. 03-00329-CV-3-RV-MD

BRENDA A. WIND,

Plaintiff-Appellant,

versus

JO ANNE B. BARNHART,
Commissioner of Social Security,

Defendant-Appellee.

_____

Appeals from the United States District Court
for the Northern District of Florida

_____

(June 2, 2005)

Before BLACK, PRYOR and FAY, Circuit Judges.

PER CURIAM:

Plaintiff-Appellant Brenda A. Wind appeals through counsel the district court's order affirming the administrative law judge's ("ALJ's") denial of Wind's applications for supplemental security income benefits ("SSI"), filed pursuant to 42 U.S.C. § 1383(c), and for disability insurance benefits ("DIB"), filed pursuant to 42 U.S.C. § 405(g). Wind argues on appeal that the ALJ's decision not to grant benefits to her was not supported by substantial evidence because the ALJ (1) erroneously failed to determine that Wind suffered from the "severe" impairment of obesity, (2) failed to properly evaluate and weigh medical evidence, (3) failed to recontact Wind's treating physician, and (4) posed an improper hypothetical question to the vocational expert ("VE"). For the reasons set forth more fully below, we affirm the district court's order.

In February 2000, Wind filed an application for DIB and a report, alleging disability commencing February 1, 1997, based on depression and anxiety attacks, and an application for SSI, based on an anxiety-related disorder. Both of her applications were denied through the reconsideration level. Wind then requested a hearing before an ALJ.

On December 18, 2001, at the time of the hearing, Wind was 46 years old; weighed 245 pounds; and had a high school diploma, training to be a certified nursing assistant, and some business school. Her past employment experience

included working as a nursing assistant and as a home attendant. Wind stated that her doctor recommended that she stop working as a nursing aid in 1997, because of her depression. Wind also stated that she was taking Zoloft to treat her depression and her "bad panic attacks."

Wind described her daily activities as including living in a house with her 15-year-old son, getting up at approximately 10 a.m., and going to bed at approximately 11 p.m., although she had difficulty sleeping. She stated that she "sometimes" did housework, cooking, washing dishes, and visiting with friends or relatives. She also drove her vehicle occasionally, enjoyed reading fiction and watching television, and sometimes went to church and walked for a few blocks. On her counsel's questioning, Wind stated that she occasionally had crying spells from her nervousness. Wind also stated that she had high blood pressure, but that she managed this condition with medication.

The medical evidence before the ALJ revealed that, in May 1999, Dr. Cynthia Javellana, M.D., a psychiatrist, examined Wind on referral from Wind's primary care physician, Dr. Carmen DeLaRosa, M.D. As part of this examination, Dr. Javellana observed that Wind (1) was neat and well-groomed; (2) appeared of average intellect; and (3) had fair insight, judgment, and coping abilities; and (4) had no acute physical distress. Dr. Javellana also found that, although Wind

3

was pleasant and cooperative, she appeared sad and tearful and acknowledged feeling anxious, depressed, and helpless at times. Dr. Javellana diagnosed Wind as suffering from dysthymic disorder (a chronic disturbance of mood characterized by mild depression or loss of interest in usual activities) with anxiety symptoms.

In June 1999, the Commissioner directed Dr. A. Mitch Cooper, Ph.D, a psychologist, to examine Wind. Wind informed Dr. Cooper that she had been depressed and anxious "on and off all [her] life." Wind also stated that, although she had two to three panic attacks per day, these attacks recently had decreased in frequency and intensity. Wind believed that this improvement, along with her improved sleeping, was attributable to her taking Zoloft. Wind told Dr. Cooper that, on a typical day, she preferred to stay at home alone, straightened her house and did household chores, enjoyed making crafts and doing handiwork, sometimes painted or visited yard sales, liked to read and watch television, and volunteered at her church.

After completing his examination, Dr. Cooper determined that Wind was alert and oriented, her recent and remote memory were intact, her thoughts were logical and coherent with no indication of delusional material or bizarre content, her mood appeared depressed and somewhat anxious, her affect was consistent with her mood, she denied any suicidal ideation, and her capacity for insight and

4

judgment for daily living were fair. Dr. Cooper diagnosed Wind with depressive disorder and panic disorder with mild agoraphobia; stated that her prognosis was "guarded"; and recommended that she receive individual psychotherapy to supplement her medication.

From July 1999 through April 2000, Dr. Javellana met briefly with Wind on five occasions, during which meetings Dr. Javellana noted that Wind's mental status remained generally unchanged, assigned her a Global Assessment Functioning ("GAF") score of 55[1], and continued prescribing her Zoloft. In April 2000, the last time Wind met with Dr. Javellana, Wind complained of increased episodes of anxiety and depression. Dr. Javellana, however, noted that Wind was pleasant and cooperative, remained verbal and logical, denied delusions or paranoia, was mildly anxious and depressed, and was competent to give informed consent for treatment. Dr. Javellana again diagnosed Wind with dysthymic disorder and mood disorder, secondary to chronic pain; assessed a GAF of 55; and informed Wind that she would be transferring Wind's case to a colleague for future follow-up care.

---

[1] GAF scores between 51 and 60 reflect moderate symptoms, including moderate difficulty in social, occupational, or school settings. GAF scores between 61 and 70 reflect mild symptoms, with some difficulty in social and occupational functioning. See American Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders 34 (4th ed. 2000).

On June 20, 2000, Dr. Javellana completed a Residual Functional Capacities ("RFC") Form, opining that Wind suffered from moderate[2] restrictions in her (1) activities of daily living; (2) concentration, persistence, and pace; (3) ability to understand, carry out, and remember instructions in a work setting; (4) ability to respond to coworkers and supervision in a work setting; and (5) her ability to perform simple and repetitive tasks. Dr. Javellana also determined that Wind had a moderate to marked restriction in maintaining social functioning. In addition, Dr. Javelanna indicated that Wind had not had episodes of deterioration or decompensation at work.

On the other hand, in an identical form Dr. Javellana completed on September 11, 2000, Dr. Javellana opined that Wind only suffered from moderate restrictions in maintaining her social functioning, along with her concentration, persistence, and pace. Also contrary to her June 2000 assessment, Dr. Javellana determined that Wind suffered from marked restrictions in her activities of daily living, her ability to respond to supervision in a work setting, and her ability to perform repetitive tasks in a work setting. Moreover, Dr. Javellana opined that

_____

[2] The applicable form defines a "moderate" restriction as "an impairment which affects but does not preclude the ability to function." A "marked" restriction is "an impairment which seriously affects ability to function."

Wind had a GAF of 50 to 55, and that she was "unable to maintain work without further stabilization and rehabilitation."

In addition to the admission of this medical evidence, a VE testified at Wind's administrative hearing, stating that Wind's past relevant work was as a nursing assistant and a home attendant, both of which were medium, semi-skilled work. The ALJ then asked the VE the following hypothetical question:

> Assume I was to limit [Wind] to medium-type work . . . physically, but I'm going to take into account that she has psychological and emotional problems that will bring her to a limited but satisfactory, a mild to moderate description of her ability to perform repetitive tasks in a work setting, interact with supervisors, deal with work stresses, maintaining attention and concentration; [inaudible] remember and carry out instructions; and to relate predictably in social situations. [Inaudible]. With those restrictions, would there be jobs in the job [market]?

The VE replied that, although Wind could not perform her past relevant work, she could perform the works of positions such as a laundry worker or a hand packager. Moreover, when the ALJ asked the VE if this conclusion would change if he assumed that Wind had a marked limitation in her ability to perform repetitive tasks in a work setting and in interacting with supervisors, the VE responded that these conditions "would preclude any work activity."

The ALJ initially determined that Wind previously filed applications for DIB and SSI, with a protective filing date of May 13, 1998, which were denied on

August 20, 1998, and applications for DIB and SSI, with a protective filing date of December 14, 1998, which were denied on August 12, 1999. The ALJ noted that, although these applications were eligible for reopening with a showing of good cause and cause respectively, reopening was not warranted. The ALJ also determined that, because Wind's last applications were denied on August 12, 1999, the earliest date that she could be found disabled was August 13, 1999. Thus, because Wind only was insured up to December 31, 1998, she was precluded from obtaining DIB benefits.[3]

The ALJ next determined that Wind had severe impairments primarily due to hypertension, depression, anxiety, and panic disorder, but that these severe impairments, singly or in combination, did not meet or equal any of the listings. After discussing Wind's alleged limitations and medications, the ALJ found that Wind had made a number of conflicting statements about her daily activities and the severity of her limitations. The ALJ also determined that Wind's subjective complaints "far exceed[ed] what could reasonably be expected in light of the objective findings." In discussing this last point, the ALJ explained that (1) there

---

[3] Wind has not challenged this determination on appeal. We, therefore, conclude that any arguments on it are abandoned. See Access Now, Inc. v. Southwest Airlines Co., 385 F.3d 1324, 1330 (11th Cir. 2004) (issues not argued in initial brief are deemed abandoned). Regardless, as the ALJ determined, a claimant only is eligible for DIB benefits if she demonstrates disability on or before the last date for which she was insured. See 42 U.S.C. § 423(a)(1)(A).

were no objective findings supporting her complaints of chronic pain; and (2) although Wind was obese and had hypertension, "there [was] no indication that these impairments limit[ed] her to less than medium exertion," and "[h]er primary limitations [were] mental."

The ALJ discussed that Dr. Cooper, as a consulting physician, had examined Wind in August 1999, and that Wind had informed him that she was having two or three panic attacks per day. Nevertheless, the ALJ determined that this statement was in "sharp contrast" with a statement Wind had made three days later that Zoloft was effective in treating her panic attacks, and with her statements to Dr. Cooper that her panic attacks had become less frequent and less intense than "previously when she was not taking medications." The ALJ noted, as well, that Wind's credibility was at issue because, although Wind told Dr. Javellana in January 2000, that she was suffering chronic back pain, Dr. DeLaRosa's records from that period did not show any reference to such pain complaints or to relevant medications. Moreover, the ALJ generally discussed that Dr. Cooper had determined that Wind had symptoms relating to her mental health limitations, but he believed that Wind was responding well to treatment.

The ALJ then examined the two mental health assessments completed by Dr. Javellana. The ALJ concluded that, although Dr. Javellana's determination

9

that Wind was "unable to maintain work without further stabilization and rehabilitation" was, in effect, a finding of "disability," this finding was not binding on the ALJ, pursuant to 20 C.F.R. §§ 404.1527(e), 416.927(e). The ALJ further determined that, because Dr. Javellana's last examination of Wind was in April 2000, and because Dr. Javellana's notes from that meeting were generally consistent with the June assessment, there was neither evidence to support the September assessment, nor to explain the "dramatic difference in the two assessments." Thus, the ALJ concluded:

> [T]here is no reason to believe that the September evaluation was anything other than an aberration, based on a temporary exacerbation of symptoms. They are not expected to continue at that level for more than a short period of time. Therefore, the September assessment is given little weight. The June assessment appears to provide a more accurate evaluation of the claimant's limitations.

The ALJ also stated that the opinions of the state agency physicians were consistent with and lent further support to the June assessment.

Based on these credibility findings, the ALJ determined that Wind could not return to her past relevant work as a nursing assistant or as a home attendant. However, relying on the VE's testimony that someone with Wind's same restrictions could perform such work as a laundry worker and a hand packager, the ALJ determined that Wind could perform jobs that existed in significant numbers

10

in the national economy.  Thus, the ALJ concluded that Wind was not disabled.

Wind appealed to the Appeals Council, which issued a denial of request for review.  Wind subsequently filed a civil action in the district court and a supporting brief, raising the same issues as on appeal.  The magistrate judge issued a report, recommending that the ALJ's decision be affirmed.  Over Wind's objections, the district court adopted this recommendation.

Wind generally argues that the ALJ's decision not to grant benefits was not supported by substantial evidence.  The social security regulations establish a five-step evaluation process, which is used to determine both DIB and SSI claims.  See Phillips v. Barnhart, 357 F.3d 1232, 1237 (11th Cir. 2004).  Under this evaluation process, the ALJ must determine: (1) is the individual performing substantial gainful activity; (2) does she have a severe impairment; (3) does she have a severe impairment that meets or equals a [listed impairment]; (4) if not, can she perform her past relevant work; and (5) based on her age, education, and work experience, can she perform other work of the sort found in the national economy.  Id.

Our review in a Social Security case is the same as that of the district court. Miles v. Chater, 84 F.3d 1397, 1400 (11th Cir. 1996).  We have explained that

> [We] must review the agency's decision and determine whether [the agency's] conclusion, as a whole, was supported by substantial evidence in the record.  Substantial evidence is something more than

a mere scintilla, but less than a preponderance. If the Commissioner's decision is supported by substantial evidence, this Court must affirm, even if the proof preponderates against it. We may not decide facts anew, reweigh the evidence, or substitute our judgment for that of the Commissioner.

Dyer v. Barnhart, 395 F.3d 1206, 1210 (11th Cir. 2005) (internal quotations and marks omitted).

a. **Whether the AlJ erred in failing to determine that Wind suffered from the severe impairment of obesity**

As a preliminary matter, Wind argues that the ALJ erred in not finding that Wind established that she suffered from the severe impairment of obesity. Wind asserts that, at a height of 5'5, her lowest weight, 223 pounds, constituted Level II obesity, and her weight at the administrative hearing, 245 pounds, constituted morbid obesity.

At the second step of the sequential-disability determination, the ALJ must "consider the medical severity of [the claimant's] impairments." Phillips, 357 F.3d at 1237 (quoting 20 C.F.R. § 404.1520(a)(4)(ii)). In doing so, the ALJ must determine whether the impairments, alone or in combination, "significantly limit" the claimant's "physical or mental ability to do basic work skills." Phillips, 357 F.3d at 1237 (citing 20 C.F.R. § 404.1520(c)).[4] An impairment should be

---

[4] Although Phillips cites to § 404.1520(c), the regulation applicable for DIB benefits, and this appeal involves 20 C.F.R. § 404.920(c), the regulation applicable for SSI benefits, we have

12

considered "not severe" only if "it is a slight abnormality which has such a minimal effect on the individual that it would not be expected to interfere with the individual's ability to work, irrespective of age, education or work experience." Bridges v. Bowen, 815 F.2d 622, 625 (11th Cir. 1987) (citation omitted); see also McDaniel, 800 F.2d at 1031 (defining claimant's burden as mild). However, a diagnosis or a mere showing of "a deviation from purely medical standards of bodily perfection or normality" is insufficient; instead, the claimant must show the effect of the impairment on her ability to work. McCruter v. Bowen, 791 F.2d 1544, 1547 (11th Cir. 1986).

In the instant case, Wind is arguing that the ALJ erred in not including obesity in its list of her severe impairments. Assuming that Wind's weight fell within the applicable definition, obesity should be considered, among other impairments, because it can cause further degradation of a claimant's physical capacity, especially in the presence of certain impairments. See Social Security Ruling 02-1p. However, as the ALJ explained in his decision, the record contains no evidence showing that Wind's obesity affected her ability to perform medium work-related activities. Thus, the ALJ did not err in concluding that this

---

concluded that these regulations involve the same sequential evaluation process and, thus, should be analyzed in the same way. See McDaniel v. Bowen, 800 F.2d 1026, 1031 n.4 (11th Cir. 1986).

impairment was "severe." See McCruter, 791 F.2d at 1547; see also Wilson v. Apfel, 179 F.3d 1276, 1278 (11th Cir. 1999) (concluding that substantial evidence supported the ALJ's finding that the claimant's occasional episodes of hospitalization for sickle cell anemia did not demonstrate a "severe" impairment).

### b. Whether the ALJ erred in failing to properly evaluate and weigh evidence

Wind also argues that the ALJ erred in failing to give appropriate weight to Dr. Javellana's September 2000 assessment, which showed that she could not engage in any substantial gainful employment. Wind contends that, in rejecting the September 2000 assessment, the ALJ "clearly exceed[ed] his expertise and act[ed] as a medical expert as well as a judge." Wind argues that, because it is difficult to evaluate mental impairments, the ALJ should have deferred to the opinions of Dr. Javellana, who was both a psychiatrist and the only treating physician who completed mental RFC assessments. Moreover, Wind asserts that Dr. Javellana's September 2000 findings were corroborated by Dr. Cooper's report, and that the ALJ erred in failing to state what weight he had assigned Dr. Cooper's opinion.

To the extent Wind is challenging the ALJ's evaluation of Dr. Javellana's September 2000 assessment, in determining whether an individual is disabled, "the

14

testimony of a treating physician must be given substantial or considerable weight unless 'good cause' is shown to the contrary." Crawford v. Comm'r of Social Security, 363 F.3d 1155, 1159 (11th Cir. 2004) (quotation omitted). Moreover, the ALJ commits error if he substitutes his own uninformed medical evaluations for those of a claimant's treating physicians absent good cause, Graham v. Bowen, 786 F.2d 1113, 1115 (11th Cir. 1986), or if he fails to articulate clearly his reason for according this evidence less weight, MacGregor v. Bowen, 786 F.2d 1050, 1053 (11th Cir. 1986).

Nevertheless, good cause to discredit a treating physician's opinion on disability or inability to work exists where the doctor's opinion is not supported by the evidence, is inconsistent with the physician's own medical records, or merely is conclusory. Lewis v. Callahan, 125 F.3d 1436, 1440 (11th Cir. 1997). "[C]hoosing between conflicting evidence is a task particularly suited to the fact finder." Landry v. Heckler, 782 F.2d 1551, 1554 (11th Cir. 1986). Indeed, "[t]he commissioner may reject the opinion of any physician when the evidence supports a contrary conclusion." Bloodsworth v. Heckler, 703 F.2d 1233, 1240 (11th Cir. 1983).

Here, in a mental RFC assessment Dr. Javellana completed on September 11, 2000, Dr. Javellana opined that Wind only suffered from a moderate limitation

in her social functioning, concentration, persistence, and pace. Moreover, Dr. Javellana determined that Wind suffered from marked restrictions in her activities of daily living, her ability to respond to supervision in a work setting, and her ability to perform repetitive tasks in a work setting. Dr. Javellana also opined that Wind's current GAD was 50 to 55, and that Wind was "unable to maintain work without further stabilization and rehabilitation."

However, in Dr. Javellana's June 2000 assessment, she concluded that Wind had only moderate restrictions in: her activities of daily living; her concentration, persistence, and pace; her ability to understand, carry out, and remember instructions in a work setting; and her ability to respond to coworkers in a work setting and perform simple and repetitive tasks. Dr. Javellana's conclusion in her September 2000 assessment that Wind only suffered a moderate limitation in her social functioning also inexplicably was contradicted by her determination in June 2000, that Wind had a marked limitation in this area. In addition, Dr. Javellana's treatment notes, from May 1999 through April 2000, reflected that, although Wind was suffering from dysthymic disorder, depression, and from anxiety, she was being treated with Zoloft and her mental status remained generally unchanged. In fact, in April 2000, Dr. Javellana noted that Wind was pleasant and cooperative, remained verbal and logical, denied delusions or paranoia, only was mildly

16

anxious and depressed, was competent to give informed consent for treatment, and had a GAF score reflecting moderate symptoms.[5]

Furthermore, Dr. Javellana's September 2000 assessment was contradicted by Wind's own statements to the examining physicians that she volunteered at her church, straightened the house, performed household chores, made handicrafts, painted, visited yard sales, read, and watched television. See Macia v. Bowen, 829 F.2d 1009, 1012 (11th Cir. 1987) (the ALJ may consider a claimant's daily activities when evaluating her subjective complaints and determining the issue of RFC). Because Dr. Javellana's conclusions in her September 2000 assessment were inconsistent and not supported fully by her own treatment notes, the ALJ's determination that this assessment—which was completed approximately five months after her last visit with Wind—was not entitled to significant weight was supported by substantial evidence. See Lewis, 125 F.3d at 1440.

To the extent Wind also is arguing that the ALJ erred in failing to state what weight he gave to Dr. Cooper's opinion as a consulting physician, the ALJ discussed that Dr. Cooper, as a consulting physician, had examined Wind in

---

[5] We note, however, that, as the Commissioner concedes, the Commissioner has declined to endorse the GAF scale for "use in the Social Security and SSI disability programs," and has indicated that GAF scores have no "direct correlation to the severity requirements of the mental disorders listings." See 65 Fed. Reg. 50746, 50764-65 (Aug. 21, 2000).

August 1999, and had believed that Wind was responding well to treatment but continued to have some symptoms. The ALJ also discussed that Wind had told Dr. Cooper that her panic attacks had become less frequent and less intense than "previously when she was not taking medications." Although the ALJ did not explicitly state that he was finding credible Dr. Cooper's assessment, this determination was implicit from his reliance on Dr. Cooper's opinion in concluding both that Wind's subjective complaints were not fully credible and that Dr. Javellana's June 2000 assessment was more accurate than her September 2000 assessment. See Dyer, 395 F.3d at 1210 (although a credibility determination "must be obvious to the reviewing court," we do not require "an explicit finding as to credibility").

In addition, although Dr. Cooper noted that Wind's mental condition was "guarded," and that she would benefit from receiving individual psychotherapy to supplement her medication, his findings as to her mental status were similar to those contained in Dr. Javellana's April 2000 report and her June 2000 assessment. Indeed, in finding that Dr. Javellana's June 2000 assessment was more credible, the ALJ noted, albeit in a conclusory fashion, that this finding was supported by the opinion of the state agency consulting physicians. Thus, the ALJ outlined his reasons for making credibility determination, including giving weight

18

to Dr. Cooper's assessment and finding not credible Dr. Javellana's September 2000 assessment, and because these reasons were based on objective evidence, the ALJ's decision was supported by substantial evidence in the record. See Lewis, 125 F.3d at 1440.

     **c.**     **Whether the ALJ erred in failing to recontact Dr. Javellana**

Wind argues that, instead of guessing why Dr. Javellana's September 2000 assessment differed from her previous assessment, the ALJ had the duty to recontact this expert for clarification. "It is well-established that the ALJ has a basic duty to develop a full and fair record." Ellison v. Barnhart, 355 F.3d 1272, 1276 (11th Cir. 2003) (citing 20 C.F.R. § 416.912(d)); see also Graham v. Apfel, 129 F.3d 1420, 1422 (11th Cir. 1997) (explaining that a hearing before an ALJ is not an adversarial proceeding). Indeed, the ALJ must develop the facts fully and fairly and probe conscientiously for all the relevant information, even where a claimant is represented by counsel. Cowart v. Schweiker, 662 F.2d 731, 735 (11th Cir. 1981).

Moreover, it is reversible error for an ALJ not to order a consultative examination when such an evaluation is necessary to make an informed decision. Reeves v. Heckler, 734 F.2d 519, 522 n.1 (11th Cir. 1984). An ALJ, however, is not required to seek additional independent expert medical testimony before

19

making a disability determination if the record is sufficient and additional expert testimony is unnecessary.  See Wilson, 179 F.3d at 1278.

As discussed above, Wind generally contends that, instead of guessing at a reason for the inconsistencies in Dr. Javellana's two assessments, the ALJ should have recontacted Dr. Javellana to clarify which of her findings gave rise to this inconsistency.  However, the record does not reflect that Dr. Javellana examined, much less made any additional findings, between her assessments in June and September 2000.  Moreover, Wind failed to produce evidence showing that it was necessary for the ALJ to order another evaluation before making his decision.  See Ellison, 355 F.3d at 1276 ("the claimant bears the burden of proving that [s]he is disabled, and, consequently, [s]he is responsible for producing evidence in support of [her] claim").  Thus, the court did not err in not recontacting Dr. Javellana.

### d.  Whether the ALJ posed a proper hypothetical question to the vocational expert

Last, Wind argues that the ALJ erred in relying on the VE's opinion in determining her RFC because the ALJ failed to ask the VE a hypothetical question that comprehensively described her vocational situation.  Wind specifically contends that, in posing this hypothetical question, the ALJ's wording (1) was confusing; (2) did not reflect the severity of Wind's impairments, even as the ALJ

20

found them to exist; and (3) was not supported by the medical evidence. Wind also asserts that, this error was not harmless because, had the VE been informed that Wind had "moderate" limitations, instead of "mild to moderate" or a "limited but satisfactory" ability to work, the VE may have responded differently.

If a claimant is unable to do past relevant work, as was the case here, "the examiner proceeds to the fifth and final step of the evaluation process to determine whether in light of the [RFC], age, education, and work experience the claimant can perform other work." Wilson v. Barnhart, 284 F.3d 1219, 1227 (11th Cir. 2002). We further explained in Wilson:

> The ALJ must articulate specific jobs that the claimant is able to perform, and this finding must be supported by substantial evidence, nor mere intuition or conjecture. If non-exertional impairments exist, the ALJ may use Medical-Vocational Guidelines as a framework to evaluate vocational factors, but must also introduce independent evidence, preferably through a [VE's] testimony, of existence of jobs in the national economy that the claimant can perform.

Id. (internal citations omitted). Moreover, as both parties agree, "for a [VE's] testimony to constitute substantial evidence, the ALJ must pose a hypothetical question which comprises all of the claimant's impairments." Id.

In arguing that the ALJ posed improper hypothetical questions, Wind cites to Pendley v. Heckler, 767 F.2d 1561 (11th Cir. 1985). In Pendley, we examined a case involving a hypothetical question in which the ALJ described the claimant's

physical impairment, but did not ask the expert to assume the claimant's anxiety or depression, both of which the ALJ found to be "severe impairments limiting the claimant's ability to work." Pendley, 767 F.2d at 1562. We reversed and remanded, based on our determination that we could not assume that the VE would have given the same answer had the ALJ instructed him to consider all of the appellant's severe impairments. Id. at 1563.

In the instant case, the ALJ similarly determined that the claimant suffered from, among other severe impairments, depression and anxiety. However, unlike the facts in Pendley, the ALJ instructed the VE in his first hypothetical question to assume that Wind had "psychological and emotional problems that [would] bring her to a limited but satisfactory, a mild to moderate description of her ability to perform [certain work tasks]." Moreover, despite that the ALJ found that Wind's relevant mental limitations were "moderate," his use of the words "limited but satisfactory" and "mild to moderate" did not mis-characterize the degree of Wind's mental limitations. As discussed above, the June 2000 assessment on which the ALJ relied in determining that Wind had "moderate" restrictions specifically defined "moderate" restrictions as "an impairment which affects but does not preclude the ability to function."

22

Furthermore, in posing his second hypothetical question, the ALJ explicitly distinguished between "moderate" and "marked" limitations and established that, if Wind's mental limitations were "marked," she would not have been able to perform any job in the national economy. The ALJ, therefore, posed a hypothetical question that accurately comprised all of Wind's impairments. Thus, the ALJ properly relied on the VE's testimony as substantial evidence. See Wilson, 284 F.3d at 1227

In sum, the ALJ did not err in (1) failing to determine that Wind's obesity was a "severe impairment," (2) evaluating the opinions of Dr. Javellana and Dr. Cooper, (3) not recontacting Dr. Javellana, and (4) posing hypothetical questions to the VE. Accordingly, we conclude that the district court properly determined that the ALJ's decision not to grant benefits to Wind was supported by substantial evidence. We, therefore, affirm the district court's order affirming the ALJ's decision.

**AFFIRMED.**