[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 18-12083

_____

D.C. Docket No. 8:16-cv-03203-AAS

ROBERT MATTHEW ROSS,

Plaintiff-Appellant,

versus

COMMISSIONER OF SOCIAL SECURITY,

Defendant-Appellee.

_____

Appeal from the United States District Court
for the Middle District of Florida

_____

(November 25, 2019)

Before JILL PRYOR, GRANT, and ANDERSON, Circuit Judges.

PER CURIAM:

Plaintiff-Appellant Robert Ross ("Ross") appeals the magistrate judge's order[1] affirming the Commissioner of Social Security's ("Commissioner") denial of his application for disability insurance benefits, pursuant to 42 U.S.C. § 405(g). On appeal, Ross argues: (1) that the administrative law judge ("ALJ") erred when he assigned limited weight to the opinions of his treating psychologist, Dr. Candice Stewart-Sabin; and (2) that substantial evidence does not support the ALJ's determination that Ross was not credible. We assume the parties are familiar with the facts and procedural history of the case and do not recount them here. Following a helpful oral argument and our careful review of the parties' briefs, relevant parts of the record, and applicable law, we affirm the magistrate judge's order affirming the Commissioner's denial of Ross's application for disability insurance benefits.

**I.**

When, as here, an ALJ denies benefits and the Appeals Council denies review, we review the ALJ's decision as the Commissioner's final decision. Doughty v. Apfel, 245 F.3d 1274, 1278 (11th Cir. 2001). We review de novo the legal principles upon which an ALJ based his decision but review the resulting decision "only to determine whether it is supported by substantial evidence."

---

[1] The parties consented to the magistrate judge conducting all proceedings and ordering the entry of a final judgment in accordance with 28 U.S.C. § 636(c) and Rule 73 of the Federal Rules of Civil Procedure.

2

Moore v. Barnhart, 405 F.3d 1208, 1211 (11th Cir. 2005).  Substantial evidence is "less than a preponderance, but rather such relevant evidence as a reasonable person would accept as adequate to support a conclusion."  Id.  "This limited review precludes deciding the facts anew, making credibility determinations, or re-weighing the evidence."  Id.  (citation omitted).  Indeed, where "the Commissioner's decision is supported by substantial evidence we must affirm, even if the proof preponderates against it."  Phillips v. Barnhart, 357 F.3d 1232, 1240 n.8 (11th Cir. 2004).

The Social Security regulations outline a five-step process the ALJ must use to determine whether a claimant is disabled: (1) whether he is engaged in substantial gainful activity; (2) if not, whether he has a severe impairment or combination of impairments; (3) if so, whether that impairment, or combination of impairments, meets or equals the listings in 20 C.F.R. § 404, Subpart P; (4) if not, whether he can perform his past relevant work in light of his residual functional capacity; and (5) if not, whether, based on his residual functional capacity, age, education, and work experience, he can perform other work found in the national economy.  Winschel v. Comm'r of Soc. Sec., 631 F.3d 1176, 1178 (11th Cir. 2011); 20 C.F.R. §§ 404.1520(a)(4)(i)–(v), 416.920(a)(4)(i)–(v).

At step four of the sequential analysis, the ALJ must determine a claimant's residual functional capacity ("RFC") by considering all relevant medical and other evidence. Phillips, 357 F.3d at 1238.

In determining the claimant's RFC, the ALJ must "state with particularity the weight given to different medical opinions and the reasons therefor." Winschel, 631 F.3d at 1179. The ALJ generally grants more weight to a medical opinion the longer a medical provider has treated a claimant and the more knowledge that the provider has about a claimant's impairment. 20 C.F.R. § 404.1527(c)(2)(i), (ii).[2] The ALJ assigns more weight to a provider's opinion based on the amount of "relevant evidence" provided to support it, as well as the strength of her explanation. Id. § 404.1527(c)(3). The ALJ also assigns more weight when the medical opinion is consistent with the record and when the provider is a specialist in the area. Id. § 404.1527(c)(4), (5). The ALJ reserves certain administrative findings for his own determination, and thus a provider's opinions that a claimant is disabled and that the claimant's impairment is severe

---

[2] On January 18, 2017, the Social Security Administration issued final rules revising the regulations applicable to the evaluation of medical opinion evidence. See Revisions to Rules Regarding the Evaluation of Medical Evidence, 82 Fed. Reg. 5844-01, 5869 (January 18, 2017) (modifying 20 C.F.R. § 404.1527). The revised regulations, which were codified at 20 C.F.R. § 404.1520c, apply only to claims filed on or after March 27, 2017. Id. Ross filed his initial disability application on October 7, 2014. Accordingly, we consider the regulations set forth at 20 C.F.R. § 404.1527 in his case.

4

enough to meet one of the listed impairments are not due special significance. Id. § 404.1527(d).

The ALJ must give a treating provider's medical opinion "substantial or considerable weight," unless the ALJ clearly articulates good cause for discrediting that opinion. Winschel, 631 F.3d at 1179. "Good cause exists when the: (1) treating physician's opinion was not bolstered by the evidence; (2) evidence supported a contrary finding; or (3) treating physician's opinion was conclusory or inconsistent with the doctor's own medical records." Id. (quotation marks omitted). When the ALJ articulates specific reasons for failing to give the opinion of a treating provider controlling weight, and those reasons are supported by substantial evidence, we will not reverse the Commissioner's decision. Moore, 405 F.3d at 1212. We have also held that an ALJ does not need to give a treating provider's opinion considerable weight if the evidence of the claimant's daily activities contradicts the opinion. See Phillips, 357 F.3d at 1241.

Here, the ALJ determined that Ross did not have the residual functional capacity to perform any of his past relevant work, which he categorized as "medium" work as defined in 20 C.F.R. § 404.1567(b). However, he concluded that Ross had the capacity to perform "light work." In arriving at this decision, the ALJ considered the available medical records and the testimony and evidence presented at the hearing. Indeed, the ALJ concluded on the basis of the medical

5

evidence, including that of Ross's treating provider, Dr. Stewart-Sabin, that he did have severe impairments, primarily from his post-traumatic stress disorder (PTSD). And the ALJ formulated a very restricted RFC—he concluded that Ross "was not able to work in exposure to loud or greater noise. He was able to do routine and repetitive tasks only, and he was not able to do tasks requiring public contact or more than occasional interactions with co-workers." Ultimately, the ALJ decided to only give "limited weight" to the testimony of Dr. Stewart-Sabin. Ross contends that this was in error. We disagree.

The ALJ articulated good cause, supported by substantial evidence, for giving Dr. Stewart-Sabin's hearing testimony only "limited weight." To begin, we note that in the absence of clearly articulated good cause supported by substantial evidence, Dr. Stewart-Sabin's hearing testimony would ordinarily be entitled to substantial weight because she was a licensed psychologist who specialized in veteran care and regularly treated Ross. See 20 C.F.R. §§ 404.1502(a)(2), 404.1527(c)(2), (4), (5). The ALJ's decision did, however, describe how Dr. Stewart-Sabin's hearing testimony was inconsistent not only with her treatment records but also with Ross's own description of his daily activities. In reviewing Dr. Stewart-Sabin's hearing testimony, the ALJ expressly noted that during Dr. Stewart-Sabin's treatment of Ross, her contemporaneous treatment notes reflected mostly normal findings and her treatment regimen was conservative. The ALJ also

6

noted that Dr. Stewart-Sabin assigned global assessment of functioning ("GAF")[3]

ratings typically ranging between 55 and 60[4] and that, despite suggesting otherwise

in her hearing testimony, there were no notes or findings indicating that she or any

other medical practitioner believed Ross needed to be hospitalized because of his

PTSD.  The ALJ also expressly noted that he was "mindful of the claimant's own

description of activities, which suggest that he was not as functionally limited as

has been alleged . . . [and] has been capable of functioning within the restrictions

of the assessed residual functional capacity formulation."  The ALJ highlighted the

fact that Ross had, among other things, attended church on a weekly basis, shopped

for groceries, and taught periodic motorcycle classes (which incidentally consisted

of several hours of classes per day for three days).  He also noted that Ross was

able to prepare meals, do laundry, perform repairs, and complete yard chores.  We

conclude, therefore, that the ALJ clearly articulated his reasons for assigning

limited weight to Dr. Stewart-Sabin's hearing testimony, including primarily the

inconsistency of that hearing testimony with Dr. Stewart-Sabin's prior treatment

notes and Ross's own description of his daily activities.

---

[3] The GAF is a numeric scale that mental health providers sometimes use to rate the occupational, psychological, and social functioning of adults.  Am. Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders 32 (4th ed. 2000).

[4] See discussion infra beginning at text accompanying note 5.  As noted there, a GAF rating between 51 and 60 indicates only moderate difficulty in social and occupational settings.

7

Additionally, we conclude that the ALJ's articulated reasons constituted good cause supported by substantial evidence. In reaching this conclusion, we have closely reviewed Dr. Stewart-Sabin's treatment notes from approximately thirty-seven sessions with Ross between June 15, 2011 and May 22, 2013. These treatment notes reveal evidence that, even if it may not preponderate in favor of the ALJ's conclusion, certainly is "adequate to support [the ALJ's] conclusion" that Dr. Stewart-Sabin's hearing testimony was inconsistent with other record evidence, including her prior treatment notes and Ross's own description of his daily activities. See Moore, 405 F.3d at 1211. Dr. Stewart-Sabin diagnosed Ross with PTSD triggered primarily by catastrophic combat experiences and exacerbated by family dynamics. The ALJ did not dispute her diagnosis; nor do we. But her treatment notes, insofar as they crystallized the factual basis for her opinion, are revealing—they show a relatively conservative treatment plan that included attending psychotherapy appointments, taking his medicine, riding his motorcycle, and attending church. Though Ross certainly had some well-documented "bad days," we see no indication in the relevant treatment notes that Dr. Stewart-Sabin ever thought Ross should be hospitalized.[5] Similarly, there is no indication in the

---

[5] After reviewing the record, we find it significant that Dr. Stewart-Sabin kept Ross on bimonthly appointments, only occasionally shifting that schedule to weekly appointments. We also find it significant that, based on the treatment notes available in the record, there appear to be month-long gaps between Ross's appointments. We are unable to reconcile these facts with Dr. Stewart-Sabin's speculation that there were times that she could have hospitalized Ross.

8

treatment notes that Ross ever "bunkered down" (a term she used to indicate his total inability to function).[6] Dr. Stewart-Sabin even observed at one point shortly before Ross's date last insured that he was "successfully managing the symptoms."

Ross's GAF ratings further support the ALJ's finding that Dr. Stewart-Sabin's hearing testimony was inconsistent with her treatment notes.[7] In each of approximately thirty-seven treatment sessions with Ross, Dr. Stewart-Sabin assigned a GAF rating representing the overall severity of Ross's limitations in occupational and social functions. In thirty-two of those sessions, Dr. Stewart-Sabin assigned Ross a GAF rating between 51 and 60, which indicates only "moderate" symptoms, including moderate difficulty in social and occupational

---

[6] On only one occasion is there a description of events that even raises a possible implication of such an episode—on March 19, 2012, Ross reported to Dr. Stewart-Sabin about a custody court hearing at which his daughter revealed that she was pregnant again and was going to give the new baby to his ex-wife. Ross became upset and had to be escorted out of the courtroom. Bu even on that occasion, Ross apparently recovered his composure and met with the judge in chambers to discuss his feelings and reactions. We note that this is apparently the same judge who, two months later, awarded Ross custody of his grandchild. Moreover, at the session when Ross reported this, Dr. Stewart-Sabin assigned Ross a GAF of 54.

[7] We note that the American Psychiatric Association abandoned use of the GAF in 2013 "for several reasons, including its conceptual lack of clarity . . . and questionable psychometrics in routine practice." See Braid v. Comm'r of Soc. Sec., No. 6:13-cv-230-Orl-GJK, 2014 WL 1047377, at *5 n.9 (M.D. Fla. Mar. 18, 2014) (quoting Am. Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders 16 (5th ed. 2013)). We also note, as we have before, that "the Commissioner has declined to endorse the GAF scale for use in the Social Security and SSI disability programs, and has indicated that GAF scores have no direct correlation to the severity requirements of the mental disorders listings." Wind v. Barnhart, 133 F. App'x 684, 692 n.5 (11th Cir. 2005) (quotation marks omitted). But none of this changes the fact that Dr. Stewart-Sabin assigned Ross GAF ratings during her treatment of Ross and that those GAF ratings were, on the whole, inconsistent with her hearing testimony that Ross's PTSD was "very severe" and resulted in his "100 percent total and permanent unemployability."

settings.  Am. Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders 34 (4th ed. 2000).  Nearly two-thirds of these "moderate" GAF ratings were between 55 and 60.  And Dr. Stewart-Sabin assigned Ross a GAF rating of 50 on only five occasions, the last of which came in October 2012, some nine months before Ross's date last insured.  These five ratings do indicate "serious" symptoms that could cause serious functional limitations in social and occupational settings, see id., but a substantial majority of GAF ratings established that Dr. Stewart-Sabin thought Ross's functional limitations were, in the main, moderate.  We conclude that substantial evidence supports the ALJ's finding that Dr. Stewart-Sabin's contemporaneous treatment notes were inconsistent with her hearing testimony that Ross had "100 percent total and permanent unemployability," the limitations resulting from his PTSD were "very severe," and he met the listing for anxiety-related disorders.

We note that the ALJ did not entirely discount the evidence presented by Dr. Stewart-Sabin.  The ALJ agreed that Ross's PTSD was severe, and incorporated that determination into a very restricted RFC.  In effect, the ALJ discounted only Dr. Stewart-Sabin's hearing testimony that there were "many times I could've hospitalized him," and that Ross experienced frequent episodes of "bunkering down" such that he was essentially unemployable and met the listed impairment.  As noted above, Dr. Stewart-Sabin's contemporaneous treatment notes report no

10

facts which might support any such occasions. Our careful review of those treatment notes, and other parts of the record, similarly does not reveal support for Dr. Stewart-Sabin's conclusory statement in her hearing testimony that episodes of such intensity occurred. Nothing in the treatment notes supports Ross's assertion that he did not possess the limited capacity formulated by the ALJ—i.e., that he could do routine and repetitive tasks so long as there was no exposure to loud noise and no public contact and only occasional interactions with coworkers.

In reaching this conclusion, we are mindful of the unique and difficult challenges PTSD raises for former soldiers, like Ross, who have honorably served their country in modern warzones. We have sympathy for the excruciating traumas that Ross experienced in combat, and also in his personal life, and great respect for his persistence in accepting and benefiting from treatment. We also acknowledge, for the limited purposes of this opinion, that "PTSD is an unstable condition that . . . may wax and wane after manifestation." See Likes v. Callahan, 112 F.3d 189, 191 (5th Cir. 1997) (quoting Jones v. Chater, 65 F.3d 102, 103 (8th Cir. 1995)). Even so, we must recognize our deferential standard of review and cannot conclude that the ALJ's decision with regard to Dr. Stewart-Sabin is without substantial support in the record. It is true that an ALJ's reliance solely on face-to-face observations made in highly structured and supportive environments may not

11

constitute substantial evidence when episodic conditions like PTSD are involved.[8]

But the ALJ in this case based his decision to give limited weight to Dr. Stewart-Sabin's hearing testimony on a review of "mental status examination[s]" that very clearly took into account more than the simple fact that Ross was functioning normally during the session. Instead, we observe that Dr. Stewart-Sabin's treatment notes reveal a great deal of information that was based on Ross's own reports of his mental state and activities outside of the treatment room. In particular, Ross self-reported—and Dr. Stewart-Sabin documented—Ross's stable eating habits, unstable sleep patterns, and intrusive thoughts from combat experiences, all of which appear to have been considered in Dr. Stewart-Sabin's

[8] Cf. Mace v. Comm'r, Soc. Sec. Admin., 605 F. App'x 837, 842 (11th Cir. 2015) (observing that "[w]e must exercise great care in reaching conclusions about [a claimant's] ability or inability to complete tasks under the stresses of employment during a normal workday or work week based on a time-limited mental status examination or psychological testing by a clinician, or based on [a claimant's] ability to complete tasks in other settings that are less demanding, highly structured, or more supportive" (quoting 20 C.F.R. § 404, Subpt. P., App. 1, § 12.00(C)(3))). Mace involved a claimant with bipolar disorder and depression. Id. at 838. A panel of this Court returned the case to Commissioner for further proceedings because, in part, the ALJ failed to adequately consider the episodic nature of the claimant's impairment or the effect of controlled environments on the claimant's ability to function. Id. at 842–45. Not only is Mace an unpublished opinion without precedential value, it involved evidence of very severe mental illness and frequent decompensations and hospitalizations, facts that are very different from our case. Unlike our case, the Mace panel concluded that the ALJ erred in finding that the treating physician's opinions were inconsistent with his contemporaneous treatment notes and the other evidence. By contrast in this case, we agree with the ALJ that Dr. Stewart-Sabin's contemporaneous treatment notes are inconsistent with her oral opinions at the hearing. There is almost no evidence in Dr. Stewart-Sabin's contemporaneous treatment notes that Ross was unable to perform the light routine and repetitive work with no public contact and only occasional interaction with coworkers identified by the ALJ as the appropriate RFC. And, as noted below, Dr. Stewart-Sabin's treatment notes and Ross's own self-reports provide evidence of Ross's activities outside of controlled environments, including stressful environments like court proceedings and late night visits from child protective service agents.

12

mental status examinations even though they occurred outside of the physical and temporal boundaries of her sessions with Ross.  In addition to basing his decision on the evaluation of mental status examinations that took a broad view of Ross's mental state and activities both inside and outside the treatment room and other comfortable environments, the ALJ also correctly emphasized that Ross was compliant with his individual and group therapy.

Moreover, Dr. Stewart-Sabin's treatment notes detailed Ross's self-reported involvement with several activities that occurred in environments that were not entirely structured, supportive, comfortable, or undemanding, including several courtroom custody proceedings (only one of which appears to have resulted in an outward show of anger), late night visits from police and child protective services agents, home repair alongside neighbors following a flood, volunteer work with troubled adolescents, teaching motorcycle classes, and honor guard ceremonies for fallen soldiers.  Although these events may have affected Ross's stress level, there is no indication in Dr. Stewart-Sabin's treatment notes that Ross had to "bunker[] down" as a result of any of these activities, as she suggested in her hearing testimony that he frequently did.  Indeed, to schedule in advance activities such as his teaching, counseling, and honor guard ceremonies, Ross must have had some confidence in his ability to handle the stress involved.  Furthermore, we note that

13

these daily activities, which Dr. Stewart-Sabin included in her treatment notes, are inconsistent with her hearing testimony.    See Phillips, 357 F.3d at 1241.

Moreover, Dr. Stewart-Sabin's treatment notes are more consistent with other record evidence than was her hearing testimony.  See 20 C.F.R. § 404.1527(c)(4).  We find illustrative Ross's March 26, 2010, evaluation by Dr. Lynn Gulick, the only other psychologist who analyzed Ross's PTSD symptoms during the relevant period.  Dr. Gulick assigned Ross a moderate GAF rating and concluded that Ross's ability to work was only "somewhat impaired by PTSD" and that there was not a total occupational or social impairment.

This is not to say that the record does not contain evidence supporting Ross's claim for disability, or that there is not an alternative interpretation of the evidence that is more favorable for him.  Ross clearly had difficulty functioning during some episodes of PTSD, described the need to trust those around him before socializing, and suffered from nightmares, loss of sleep, anxiety, irritability, and vigilance.  He received a PCL-M[9] score of 68, which the parties agree indicates a "high" level of PTSD, and his service-connected disability rating with the U.S. Department of Veterans Affairs was 100% (with 30% to 50% of that

---

[9] The PTSD Checklist, Military Version (PCL-M), is used to assess symptoms of PTSD. C. Beau Nelson et al., Factors Associated With Civilian Employment, Work Satisfaction, and Performance Among National Guard Members, 66:12 Psychiatric Services 1318, 1320 (2015).  It is a self-report instrument that screens seventeen symptoms of PTSD and asks respondents to rate certain experiences on a five-point scale.  Id.  A score of 50 or more represents a positive screen for PTSD.  Id.

rating attributed to his PTSD, depending on the time period at issue).  Despite all of this, however, there was other sufficient relevant evidence for the ALJ to conclude that Dr. Stewart-Sabin's hearing testimony was inconsistent with her own treatment records, Ross's self-reporting of his functional limitations, and the other medical evidence.  Mindful of our duty to avoid deciding facts anew or re-weighing the evidence in this limited and deferential review, Moore, 405 F.3d at 1211, we conclude that the ALJ's determination to not assign controlling weight to

15

the opinions of Dr. Stewart-Sabin was supported by substantial evidence.[10]  As a

result, we will not disturb that determination on appeal.[11]

---

[10] After the briefs were filed, Ross filed a supplemental notice of authority, apprising our panel of the court's recent decision in Schink v. Commisioner of Social Security, 935 F.3d 1245 (11th Cir. 2019).  He argued that the panel in Schink reversed the denial of Social Security disability benefits on the basis of a record similar to our case's and that our decision there affected our disposition of his appeal.  After carefully reviewing the decision in Schink, although it did address the issue of an ALJ discounting the opinions of treating providers, we disagree with his characterization of the decision for several reasons.

First, in Schink, the ALJ did "not so much as hint at any real inconsistency between" the treating provider's treatment notes and their opinions in questionnaires.  935 F.3d at 1263.  The panel noted, "It is not enough merely to point to positive or neutral observations that create, at most, a trivial and indirect tension with the treating physician's opinion by proving no more than that the claimant's impairments are not all-encompassing."  Id.  We find this holding inapplicable to the facts here.  As noted in the text, the ALJ here specifically identified several genuine inconsistencies between Dr. Stewart-Sabin's treatment notes and her testimony—though she testified that Ross repeatedly "bunkered down" and that she could have hospitalized him at various points due to the severity of his symptoms, there was virtually no support for those assertions in her treatment notes.  The ALJ also indicated that the conservative treatment regimen that Dr. Stewart-Sabin formulated and the daily activities that Ross acknowledged were inconsistent with her opinion that Ross was 100% unemployable and qualified under the listed impairment of anxiety-related disorders.  Moreover, though the ALJ focused in part on Ross's mostly normal presentment during his sessions with Dr. Stewart-Sabin, he also identified genuine inconsistencies between her contemporaneous treatment notes and hearing testimony.

Second, the ALJ in Schink concluded that the claimant "did not suffer from a severe mental impairment and could return to his past job as a car salesman" and entirely omitted the claimant's mental impairment when assessing his residual functioning capacity.  Id. at 1264, 1268.  This constitutes a significant difference between Schink and Ross's case—here, the ALJ concluded that Ross did suffer from severe mental impairments, and accounted for those impairments when assessing his RFC.  It was on this basis that the ALJ in our case formulated a very restricted RFC (as noted in the text) such that the ALJ concluded that Ross could not perform any of his past relevant work, and limited Ross's capacity to jobs requiring no public contact and only occasional interaction with coworkers.

[11] Ross appears to have expressly waived any argument that the ALJ should have credited Dr. Stewart-Sabin's opinion that Ross was disabled or that his PTSD met the definition of a listed impairment.  See Appellant's Br. 47–48.  To the extent that Ross makes such an argument, however, we reject it because these determinations, which are dispositive of a case, are administrative findings expressly reserved to the ALJ by the applicable regulations.  See 20 C.F.R. §§ 404.1527(d); 416.927(d).

## II.

Ross's second argument is that the ALJ erred by not finding him entirely credible. In a Social Security hearing, a claimant may establish that he has a disability through his "own testimony of pain or other subjective symptoms." Dyer v. Barnhart, 395 F.3d 1206, 1210 (11th Cir. 2005). In such a case, the claimant must show:

> (1) evidence of an underlying medical condition and either (2) objective medical evidence that confirms the severity of the alleged pain arising from that condition or (3) that the objectively determined medical condition is of such a severity that it can be reasonably expected to give rise to the alleged pain.

Id. (quotation marks omitted). In evaluating a claimant's testimony, the ALJ should consider: (1) the claimant's daily activities; (2) the "duration, frequency, and intensity" of the claimant's symptoms; (3) "[p]recipitating and aggravating factors"; (4) the effectiveness and side effects of any medications; and

---

Finally, we must also reject Ross's argument that the ALJ somehow erred by relying on the vocational expert's testimony in response to the first (but not the second) hypothetical posed during the hearing. The first hypothetical accounted for limitations that were supported by the objective medical evidence in the record and did not include limitations to the extent described by Dr. Stewart-Sabin's hearing testimony. On the other hand, the second hypothetical did include increased limitations of the kind described by Dr. Stewart-Sabin during her hearing testimony (i.e., that Ross's ability to work consistently would be affected by more severe PTSD). Accordingly, because we have found that the ALJ's decision to give Dr. Stewart-Sabin's testimony limited weight was supported by substantial evidence, we also necessarily find that the ALJ was entitled to rely on the vocational expert's testimony in response to the first hypothetical in finding that Ross was not disabled. In other words, because the relevance of the second hypothetical rested entirely on a finding that Dr. Stewart-Sabin's hearing testimony was credible, the ALJ's reasonable finding that her testimony was not credible also meant that the ALJ was entitled to rely on the vocational expert's testimony in response to the first hypothetical. See Wilson v. Barnhart, 284 F.3d 1219, 1222, 1225–27 (11th Cir. 2002).

(5) treatment or other measures taken by the claimant to alleviate symptoms. 20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3). The ALJ is to consider these factors in light of the other evidence in the record. Id. §§ 404.1529(c)(4), 416.929(c)(4). If the ALJ discredits the claimant's testimony as to his subjective symptoms, he "must clearly articulate explicit and adequate reasons for" doing so. Dyer, 395 F.3d at 1210 (quotation marks omitted). The ALJ may also consider the consistency of the claimant's statements internally and with the rest of the record in order to make a credibility determination. SSR 96-7P, 1996 WL 374186, at *6 (July 2, 1996), superseded by SSR 16-3P, 2017 WL 5180304 (Oct. 25, 2017). Such "credibility determinations are the province of the ALJ," and we will "not disturb a clearly articulated credibility finding supported by substantial evidence." Mitchell v. Comm'r of Soc. Sec., 771 F.3d 780, 782 (11th Cir. 2014).

The ALJ clearly articulated his reasoning for finding that Ross was not entirely credible. Specifically, Ross testified that he did not really do anything at all outside the home because he does not like crowds, but the record as a whole reveals that he was able to function in public when needed. As discussed in the preceding section, the record reveals that, among other things, Ross attended church, volunteered with troubled adolescents, participated in honor guard ceremonies, and even taught motorcycle classes from time to time. Portions of Ross's testimony were consistent with the record—especially with respect to his

18

anxiety, nightmares, and combat memories—and we pass no judgment on Ross's motivations in testifying as he did.  We do conclude, however, that the ALJ's determination that Ross was not entirely credible was supported by substantial evidence, as Ross's testimony about his limited ability to function socially due to his mental impairment was inconsistent with other record evidence describing his functioning.  Consequently, we will not disturb the ALJ's determination on appeal.

## III.

For the reasons set forth above, the order of the magistrate judge affirming the Commissioner's denial of Ross's application for disability insurance benefits and dismissing the case is hereby

**AFFIRMED.**[12]

---

[12] Any other arguments asserted on appeal by Ross are rejected without need for further discussion.